ESTATE OF CECIL H. KOPPERMAN, DECEASED, JAMES B. WOLF, JR., EXECUTOR, Petitioner v. COMMISSIONER OF INTERNAL REVENUE, Respondent ESTATE OF ROSLYN F. KOPPERMAN, DECEASED, JAMES B. WOLF, JR., EXECUTOR, Petitioner v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Estate of Kopperman v. Commissioner
Docket Nos. 10315-77, 10337-77.
United States Tax Court
T.C. Memo 1978-475; 1978 Tax Ct. Memo LEXIS 40; 37 T.C.M. (CCH) 1849; T.C.M. (RIA) 78475; November 28, 1978, Filed Alan Gordon Lipson, for the petitioners. Larry L. Nameroff, for the respondent. DAWSON
MEMORANDUM FINDINGS OF FACT AND OPINION DAWSON, Judge: Respondent determined deficiencies in the Federal estate tax of the Estate of Cecil H. Kopperman in the amount of $10,313.38 and of the Estate of Roslyn F. Kopperman in the amount of $17,716.20. Concessions having been made by petitioners, the issues for decision are: 1. Did a death benefit provision in an employment agreement under which the employer of decedent Cecil H. Kopperman was to pay a designated amount to decedent's beneficiaries constitute a transfer of an interest in property within the meaning of section 2035 of the Code? *42 [1]
2. If issue (1) is decided for respondent, did decedent Cecil H. Kopperman make the transfer within three years of the date of his death? 3. If issues (1) and (2) are decided for respondent, did decedent Cecil H. Kopperman transfer such death benefits in contemplation of death? 4. If all three of the above issues are decided for respondent, what is the amount includible in the gross estate of Cecil H. Kopperman under section 2035? 5. Is the Estate of Cecil H. Kopperman entitled to any blockage discount in valuing 27,050 shares of Progressive Corporation common stock, a security traded on the "over-the-counter" market? The sole issue in the Estate of Roslyn F. Kopperman is the value of her share of her husband's estate, a mathematical computation dependent upon the resolution of the above issues. FINDINGS OF FACTS Some of the facts have been stipulated and are so found. The stipulation of facts and exhibits attached thereto are incorporated herein by this reference. Cecil H. Kopperman (age 64) and Roslyn *43 F. Kopperman (age 56), husband and wife, were killed in an airplane crash on January 25, 1974. James B. Wolf, Jr. (hereinafter petitioner) was appointed executor for each of the estates, and at the time of filing the petitions in these cases, resided in Cleveland, Ohio. Petitioner filed Federal estate tax returns on behalf of each estate with the Internal Revenue Service at Cleveland, Ohio. The executor of the Estate of Cecil H. Kopperman has elected the alternate valuation date, July 25, 1974, for valuation purposes. Prior to May 17, 1971, Cecil H. Kopperman (hereinafter the decedent) was a partner in Kopperman & Wolf, a public accounting firm, which was formed in 1958. The partnership between decedent and James B. Wolf, Jr. was formalized by a written partnership agreement, which provided, inter alia, that: ARTICLE X
Upon the death of either partner the partnership business shall not terminate but shall be continued as a partnership between the surviving partner and the estate of the deceased partner until the end of the then current calendar year at which time the same shall be dissolved in the following manner: The capital interest of the deceased partner shall *44 be determined as of the date of the dissolution and his capital interest shall include the profits or losses of the partnership to the date of said dissolution and said capital interest shall be paid to his estate within ninety (90) days after said date of dissolution. The interest of a deceased partner in the work in process at the time of dissolution shall be determined as of that time and the amount payable with respect to said work in process shall be paid to the estate of the deceased partner within ninety (90) days after said date of dissolution. Immediately upon the dissolution of the partnership as provided in this Article a new partnership shall be formed between the surviving partner and the widow of the deceased partner on the following terms and conditions: (a) A list of all of the accounts being serviced by the partnership at that time shall be made and these accounts plus the physical assets of the partnership, such as office furniture, equipment, files and books, used by the partnership shall be the property of the new partnership. (b) The surviving partner shall be the managing partner of the partnership and shall devote such time as is necessary to service the *45 accounts and further the interest of the partnership. (c) Said partnership shall commence immediately upon the dissolution of the partnership between the surviving partner and the estate of the deceased partner and shall continue for a period of twenty (20) years unless sooner dissolved by mutual agreement between the partners. (d) The income arising from the conduct of said partnership business is to be distributed as follows: 1.) In the event Cecil H. Kopperman is the surviving partner, then the widow of the deceased partner shall receive seven and one-half per cent (7 1/2%) of the gross receipts over Thirty Thousand Dollars ($30,000.00) and Cecil H. Kopperman shall receive all the rest. 2.) In the event James B. Wolf, Jr. is the surviving partner then the widow of the deceased partner shall receive fifteen per cent (15%) of the first Thirty Thousand Dollars ($30,000.00) of the gross receipts and seven and one-half per cent (7 1/2%) of all over Thirty Thousand Dollars ($30,000.00) and James B. Wolf, Jr. shall receive all the rest. (e) Neither partner may sell, assign, transfer or convey any interest in any of the accounts belonging to the partnership without the consent *46 of the other partner. (f) In the event of the death of either partner or at the end of the said twenty-year period said partnership shall be dissolved and the partnership shall be liquidated. An inventory and appraisal of all of the assets or property, including accounts receivable, shall be made at the true value thereof; an accounting shall be taken of all of the assets and liabilities and an equal division thereof shall be made between the partners or the surviving partner and the estate of the deceased partner. No provision was made for retirement in the partnership agreement. During 1970, the decedent and Mr. Wolf discussed incorporation of their partnership as a result of a change in Ohio law which would permit professional corporations. After extensive consideration and deliberation with an attorney, a professional association under the name of Kopperman & Wolf Co. was incorporated on May 17, 1971 and the partnership of Kopperman & Wolf was terminated. At the time of the corporation's formation, decedent and Mr. Wolf each owned 200 shares of the issued and outstanding shares of the capital stock of Kopperman & Wolf Co. On the same date, decedent and Mr. Wolf entered *47 into an identical employment agreement (hereinafter Agreement) with Kopperman & Wolf Co. (hereinafter the Company). The Agreement contained a death benefit provision which provided that: In the event of death of Employee, Company agrees that for thirty-six full calendar months commencing with the first day of the month after the month in which death occurs, to pay one-third (1/3) of the Employee's base salary at the time of such death to the surviving spouse, or if there is no surviving spouse, or if the surviving spouse does not survive the thirty-six (36) month period, equally to the children of such Employee, or if none at the time any payment is to be made, to the estate of the Employee. Although no definition of base salary appeared in the Agreement, it did provide that "the company shall pay employee a grosssalary of $60,000 per year commencing July 1, 1971, payable $4,000 per month and a lump sum payable on each April 15th of the term thereof". (Emphasis added). Decedent reported taxable wages of $60,000 on his 1972 Individual Income Tax Return. For the taxable year 1973 he reported taxable wages of $66,000 from the Company.
Unlike the partnership agreement, *48 the Agreement cntained a retirement clause which provided for monthly payments of one third of decedent's base salary over a sixty month period.Death during this sixty month period, however, would terminate the Company's obligation under the retirement provision and activate its obligation under the death benefit provision. In addition to the Agreement, decedent and James B. Wolf entered into a stock purchase agreement with the Company which provided: B. Obligations to Purchase Shares Upon Death of a Shareholder.
Upon the death of a Shareholder, the remaining Shareholders and Corporation--each to the extent hereafter set forth--shall have the option or obligation to purchase the decedent's share of Corporation in accordance with the provisions herein contained: (i) Corporation shall have an obligation to purchase such shares, if and to the extent that such purchase is permitted by law. (ii) To the extent that such shares may not be lawfully purchased by Corporation, the remaining Shareholders shall have the obligation to purchase same. Decedent played an active role in the corporation. Although he was a diabetic and required medication, he was otherwise in good *49 health. At the time of entering into the Agreement he did not fear impending death from his lifelong ailment. Upon decedent's death the Company proceeded to pay benefits to decedent's two daughters. In payment of its obligation under the Agreement the Company paid decedent's children a total of $48,000 during the three years subsequent to his death. Decedent, at the time of his death, owned 27,050 shares of Progressive Corporation common stock (hereinafter Progressive). Progressive was publicly traded on the "over the counter" market. On July 25, 1974, the alternate valuation date, Progressive was quoted at $4.375 Bid and $4.875 Asked. The estate, however, applied a blockage discount and valued the shares at $4 each, instead of $4.625, the mean of the bid and asked prices. Decedent's ownership of 27,050 shares represented approximately 1% of the total common shares issued and outstanding. Since a certain percentage of shares were held in restricted form, only 1,350,000 shares were considered to constitute the public stock float. Thus, decedent's ownership represented 2% of the public stock float. In 1974, the price of Progressive declined as follows: Date Month
Ended
Bid Price
High
Low
Close
1/31/74
11 1/4
9 1/2
10 3/4
3/29/74
11 3/8
10
10
5/31/74
8 3/8
5 1/4
5 1/4
6/28/74
6 3/8
4 1/4
4 1/4
7/31/74
5
4
4
11/31/74
4 1/4
2 3/8
2 3/8
*50 As a result of this decline, the Board of Directors of the Progressive Corporation authorized the purchase of its own shares. The net result of this purchase program was the acquisition by Progressive Corporation in 1974 of 293,400 shares at an average cost of $4.30 per share. During the period July 16, 1974 to July 25, 1974, the reported bid and asked figures were as follows: Date
Bid
Ask
July 16
4 1/4
4 3/4
July 18
4 1/2
5
July 22
4 3/8
4 7/8
July 24
4 3/8
4 7/8
July 25
4 3/8
4 7/8
During 1974, the average daily trading volume in Progressive was 2,650 shares. The total sales volume for 1974 was 691,000, of which 293,400 shares were purchased by Progressive Corporation. The 1973 trading volume was 1,267,400 shares. In the month of July, 1974, 151,000 shares were traded; of these 121,000 were purchased by Progressive Corporation. The 121,000 shares were purchased in four separate transactions through McDonald & Co., one of six market makers in Progressive, as follows: Price Paid by Date of Purchase
No. of Shares
Progressive
July 16
65,000
4 3/8
July 18
20,000
4 5/8
July 22
30,000
4 5/8
July 24
6,000
4 1/2
*51 Progressive Corporation's purchase of these shares was at a price below the reported asked price, the price at which a broker would ordinarily sell the securities to a buyer. The reported asked price, however, reflects the average of asked prices for that date and does not necessarily represent the actual selling price. In addition to its purchases from McDonald & Co., Progressive Corporation was purchasing its shares on a direct negotiation basis with Progressive security holders, which would obviate the necessity of paying the broker's margin between bid and asked prices. Thus, it was possible that apurchaser for the estate's shares could be found by direct negotiation or through a broker. It was also possible that a market maker might purchase the shares for its own account and then sell the shares. If no block buyer could be found, it would be possible to release 100 to 500 shares a day through the usual market and, at a maximum, it would take a three month trading period to sell all the shares. The executor of decedent's estate was a member of the Board of Directors of Progressive Corporation and was aware of the company's buying program. ULTIMATE FINDINGS OF *52 FACT 1. The death benefit provision of the Agreement constitutes a transfer of an interest in property within three years of the date of death of decedent in contemplation of death. 2. The amount includible in the gross estate of decedent is the commuted value of $48,000. 3. The value of a share of Progressive common stock was $4.25 on July 25, 1974. OPINION Section 2035 [2] provides that the value of the gross estate shall include the value of all property transferred by a decedent within three years of the date of death in contemplation of death. It further creates a rebuttable presumption that any transfer made by a decedent within three years preceding the date of his death is a transfer made in contemplation of death. *53 Since the parties have raised issues concerning each element of section 2035, we shall, for the sake of simplicity, deal with each one separately. 1. Was there a transfer of an interest in property?
It has long been settled that a "transfer of property procured through expenditure by the decedent with the purpose, effected at his death, of having it pass to another," is a transfer by decedent of property. In Chase Nat. Bank v. United States,278 U.S. 327, 337 (1929), the Supreme Court said: Sec. 402(c) taxes transfers made in contemplation of death. It would not, we assume, be seriously argued that its provisions could be evaded by the purchase by a decedent from a third person of property, a savings bank book for example, and its delivery by the seller directly to the intended beneficiary on the purchaser's death, or that the measure of the tax would be the cost and not the value or proceeds at the time of death.
While the concept of a transfer procured by consideration furnished by a decedent is free of doubt, much litigation has addressed the issue of whether various arrangements constitute such a transfer. For example, in Dimock v. Corwin,19 F. Supp. 56 (E.D.N.Y. 1937), *54 affd. on other issues 99 F.2d 799 (2d Cir. 1938), affd. 306 U.S. 363 (1939), it was held that mere expectancies or hopes on the part of an employee that his employer would pay death benefits to his widow or children did not constitute a transfer of property. If no binding obligation on the employer's part existed, the decedent did not have an interest in property capable of transfer. Estate of Barr v. Commissioner,40 T.C. 227 (1963); Estate of Salt v. Commissioner,17 T.C. 92 (1951). On the other hand, in situations in which an employee has a right to have payments made to him but elects to have such payments made to a designated beneficiary, this Court has held that a transfer of property has been made. Davis v. Commissioner,27 T.C. 378 (1956). In Davis, the fact that no payments were made for the annuities by the employee did not run afoul of the need for an interest in property as the services of the employee furnished the consideration for payments for the annuities by the employer. "Such consideration has been deemed to constitute property in which the decedent had an interest and which he transferred *55 for purposes of other estate tax provisions having a requirement comparable to that contained in section 2035." Estate of Porter v. Commissioner,54 T.C. 1066, 1077 (1970) (Tannenwald, J. Concurring). See Rosenberg v. United States,309 F.2d 724, 727 (7th Cir. 1962); Worthen v. United States,192 F. Supp. 727, 734 (D.Mass. 1961); cf. Estate of Nevin v. Commissioner,11 T.C. 59, 65 (1948). In Estate of Porter v. Commissioner,54 T.C. 1066 (1970), affd. 442 F.2d 915 (1st Cir. 1971), we held that a "transfer of property" within the meaning of that term for estate tax purposes had occurred where an employee entered into an employment contract which provided, in consideration of his future services, for certain post mortem payments by the employer to the employee's widow or children. On appeal, the First Circuit affirmed, noting additional consideration since decedent-employee, as a major shareholder in the employer, incurred detriment in the execution of identical contracts by the corporation with other shareholder-employees. In the instant case the decedent received, as part of an *56 overall contractual package, a benefit payable to his widow or children or to his estate if neither survived him. The death benefit was to be paid whether or not the employee was in active service, retired, or discharged. The provision, moreover, could only be changed by mutual consent of the employer and employee. In return, the decedent was to furnish his services. We see no difference between this form of "deferred" compensation and a situation in which an employee receives a certain salary and gives a portion of it back to the employer for an annuity designating his widow or children as beneficiary. Since we think this case falls squarely within the ambit of Estate of Porter v. Commissioner,supra, we hold that upon the decedent's entering into the Agreement which provided for a death benefit, a transfer of an interest in property was made. Petitioner relies on Harris v. United States,72-1 U.S.T.C. P12,845, 29 A.F.T.R.2d 72-1558 (C.D. Calf. 1972), a case we find unpersuasive. In Harris, the decedent had entered into an employment contract whereby his widow was to receive a certain amount of money following his death. The District *57 Court, in an opinion which we think insufficiently considered the issue, found that: No rights existed under the January 4, 1945, agreement until it was executed by all of the parties to it. Thus, decedent had no rights under the agreement prior to January 4, 1945. Having no rights, he had nothing to transfer. Upon execution of the agreement, rights under the agreement came into existence. But even rights were rights irrevocably vested at the outset in decedent's wife (as well as the wives of the other executives). [Harris v. United States,supra at 72-1561.] In its decision the District Court distinguished Estate of Porter v. Commissioner,supra, on the basis that our opinion was limited to section 2035, while Harris involved the applicability of sections 2033, 2036 and 2038 to an employee death benefit. This distinction, while resulting in a neat avoidance of the Porter opinion, is incorrect. There is nothing in the statutes, regulations or legislative histories to suggest a different standard of interpretation for "transfer of an interest in property" when we are dealing with the various life-time transfer provisions under the *58 estate tax laws. Since we do not in return distinguish Harris on the basis that it dealt with sections 2033, 2036, and 2038, we think that the District Court was incorrect in its interpretation of the rights given under the employment contract with respect to the issue of "transfer of an interest in property." 2. When Did the Transfer Occur?
The second question to be decided is whether the transfer was made within three years of the date of death. The date of the Agreement, May 17, 1971, is within three years of the death of decedent on January 25, 1974. Petitioner contends, however, that, if a transfer was made, it occurred in 1958 at the time decedent entered into the partnership agreement with James B. Wolf, Jr. Petitioner asserts that the benefits provided in the Agreement are a mere reiteration and amendment to the death benefits under the 1958 partnership agreement and were necessitated by the change in the form of operation of the business. Thus, petitioner maintains there is a "relation back" of the Agreement to the earlier agreement. If we accept petitioner's contentions, section 2035 is inapplicable since a transfer not made within three years of death *59 is conclusively presumed not to be in contemplation thereof. Petitioner relies on Estate of Whitworth v. Commissioner,T.C. Memo. 1963-41, in support of his view. We are not persuaded, however, that this case supports petitioner here. In Whitworth, decedent had entered into an employment contract in 1952 that provided for certain post mortem payments to his widow. Subsequently, decedent's employer ("Crayon") merged into a successor corporation ("Dixon"). In the merger Dixon was to assume the obligations of Crayon including those arising under existing employment contracts. With Dixon's knowledge and consent, five executives, including decedent, entered into employment agreements with Crayon on October 1, 1956, which superseded all former such agreements. Although the new agreements provided for an extension of the employment beyond the date of the merger and to an extent altered other terms of such employment the provisions of the old agreement relating to widows' rights to benefits at the death of their respective husbands were included nearly verbatim in the new contracts. In the instant case we do not think that the death benefit provision in the Agreement *60 was a mere continuation of the "death benefit" provision in the partnership provision. First, the partnership agreement was specifically terminated and no mention of its provisions was made in the subsequent Agreement. See and compare Estate of Porter v. Commissioner,supra at 1076-1077. Moreover, an examination of the partnership agreement and Agreement indicates that the mechanics, as well as the payments, under the two provisions are dissimilar. In order for the decedent's widow to obtain a "death benefit" under the partnership agreement, she had to form a new partnership with the surviving partner, which would last a maximum of twenty years unless dissolved earlier by either party. In such a partnership she would receive a certain percentage of gross receipts. The Agreement, on the other hand, provided for a specified sum payable to the decedent's spouse if surviving, or children if surviving, or to decedent's estate if neither of the preceding beneficiaries were living at the employee's death. In light of these factors, we hold that the transfer occurred on May 17, 1971, the date decedent entered into the Agreement with his employer. 3. Was the *61 Transfer Made in Contemplation of Death?
A transfer is in contemplation of death if prompted by the thought of death, that is "if (1) made with the purpose of avoiding death taxes, (2) made as a substitute for a testamentary disposition of property or (3) made for any other motive associated with death." Section 20.2035-1(c), Estate Tax Regs. The phrase "contemplation of death" has been defined by the Supreme Court in United States v. Wells,283 U.S. 102, 118 (1931), to mean: that the thought of death is the impelling cause of the transfer, and while the belief in the imminence of death may afford convincing evidence, the statute is not to be limited, and its purpose thwarted, by a rule of construction which in place of contemplation of death makes the final criterion to be an apprehension that death is "near at hand." Thus, "Death must be 'contemplated,' that is, the motive which induces the transfer must be of the sort which leads to testamentary disposition." United States v. Wells,supra at 117. Where a death motive, rather than a purpose associated with life, is the dominant reason for the transfer, the gift is in contemplation *62 of death even if it is not made on account of the thought of impending death. The decision in any given case is a question of fact relating to the decedent's state of mind at the time of the transfer and is usually determined from a consideration of all the facts and circumstances presented in the record. United States v. Wells,supra.
In Estate of Johnson v. Commissioner,10 T.C. 680, 688 (1948), this Court stated that among the factors to be considered in determining the dominant motive of a decedent in making an inter vivos transfer of property are: (a) The age of the decedent at the time the transfers were made; (b) the decedent's health, as he knew it, at or before the time of the transfers; (c) the interval between the transfers and the decedent's death; (d) the amount of the property transferred in proportion to the amount of property retained; (e) the nature and disposition of the decedent, e.g., whether cheerful or gloomy, sanguine or morbid, optimistic or pessimistic; (f) the existence of a general testamentary scheme of which the transfers were a part; (g) the relationship of the donee or donees to the decedent, i.e., whether they *63 were the natural objects of his bounty; (h) the existence of a long established gift-making policy on the part of decedent; (i) the existence of a desire on the part of the decedent to escape the burden of managing property by transferring the property to others; (j) the existence of a desire on the part of the decedent to vicariously enjoy the enjoyment by the donees of the property transferred; and (k) the existence of the desire by the decedent of avoiding estate taxes by means of making inter vivos transfers of property. * * * The burden is on petitioner to establish that the transfer of the death benefit was predominantly motivated by life associated factors.Petitioner contends that the Agreement, including the death benefit provision, was not the result of "any special or particular relationship of decedent and his employer, or by any abnormal preoccupation by decedent with impending death." Although decedent was a diabetic and required medication, he did not anticipate impending death. Decedent was vigorously and actively involved in the day to day operations of the Company. The Agreement, as a whole, was necessitated not by decedent's concern for his health, but rather *64 by the change in the form of business organization effected in 1971.Mr. Wolf has testified most forcefully that good business reasons mandated the switch from partnership form to professional corporation status as well as the benefit of providing a full and detailed agreement outlining the obligations of the Company in all possible contingencies. However, respondent asserts, and we agree, that just because an employment contract asawhole is good business planning, it does not follow that the transfer of an interest in property effected by that agreement is not testamentary in nature nor death oriented in motive. Petitioner, we think, fails to differentiate between the life motives present in setting up and entering into an employment contract and the subsequent transfer occasioned by the Agreement's execution. The provision here by its very terms is death oriented. It is characterized in the Agreement as a death benefit. It is only enforceable and only has value upon the death of the decedent. Death benefits, like life insurance, have been characterized as inherently death oriented. Compton v. United States,532 F.2d 1086 (6th Cir. 1976); Berman v. United States,487 F.2d 70 (5th Cir. 1973). *65 Unfortunately for petitioners, we find no evidence in this record which would establish decedent's life motives for the transfer of the death benefits to his widow or children. In fact, petitioner's assertion that it was good business planning to provide for all contingencies demonstrates that a provision for post mortem payments was of some concern to decedent. Petitioner's argument that the death benefit provision was of lesser concern to the parties than the retirement provision in the Agreement may be true; however, it does not change the fact that decedent still wished to provide some form of benefit in the event of his death. We also think the considerable testimony at trial as to whether the Agreement's death benefit provision would have resulted in greater or lesser payments to decedent's beneficiaries than those possible under the partnership provision is irrelevant on the issue of motives for transfer. Since petitioner has not demonstrated evidence of dominant life motives for the transfer, we hold that the transfer was in contemplation of death. 4. What is the Value of the Death Benefit Includable in the Gross Estate Under § 2035?
Petitioner contends that the *66 base salary of decedent was $48,000. Respondent contends that in the absence of any definition of base salary in the Agreement, the term must be read to mean $60,000, the gross salary provided in the Agreement. In determining what amount is to be included in the gross estate under section 2035, the regulations provide: (e) Valuation. The value of an interest in transferred property includible in a decedent's gross estate under this section is the value of the interest as of the applicable valuation date. In this connection, see sections 2031, 2032, and the regulations thereunder. However, if the transferee has made improvements or additions to the property, any resulting enhancement in the value of the property is not considered in ascertaining the value of the gross estate. Similarly, neither income received subsequent to the transfer nor property purchased with such income is considered. [Sec. 20.2035-1(e), Estate Tax Regs.] Thus, we look to the applicable valuation date to determine the amount includable in the gross estate. The difficulty presented here is that decedent failed to define in the Agreement what exactly was meant by "base salary." Thus, the respondent would *67 have us rely on the gross salary figure without regard to what was actually paid.While we agree with respondent that events subsequent to the valuation date do not affect our valuation on that date, we think the $48,000 in payments to the children is persuasive evidence of what was intended to be "base salary." An examination of the contract reveals that decedent was to be paid $4,000 a month with a $12,000 lump sum payment at the close of the tax season. Surely, it is not stretching credulity to see that the "base salary" in the contract was $48,000 and the gross salary was considered the sum of the regular monthly payments and the lump sum payment. In addition, the testimony herein concerning base salary reasonably supports an inference that the $48,000 payment reflected the decedent's and the Company's intent as to what constituted base salary. Accordingly, the commuted value of $48,000 payable monthly over a three year period is includable in the gross estate. 5. What was the Value of Progressive Corporation Stock on July 25, 1974? Section 2031(a) requires that the value of all property owned by a decedent at his death be included in his gross estate. The relevant standard *68 of valuation is fair market value, defined in the regulations as "the price at which the property would change hands between a willing buyer and a willing seller, neither being under any compulsion to buy or sell and both having reasonable knowledge of relevant facts." Section 20.2031-1(b), Estate Tax Regs.
The regulations also provide that if there is a market, including an over-the-counter market for a particular stock, then the mean between the quoted bid and asked prices on the valuation date is the fair market value per share and is the basis for the determination of the value of the stock to be included in the gross estate. Section 20.2031-2(c), Estate Tax Regs. There are, however, certain situations in which the mean of the quoted bid and asked figures may not truly reflect fair market value. Section 20.2031-2(e), Estate Tax Regs. In that event, evidence other than the reported prices may be considered to determine fair market value. Whether such situations exist is solely a question of fact and petitioner bears the burden of proof. Rule 142, Tax Court Rules of Practice and Procedure.
Petitioner contends that the introduction of 27,050 shares of Progressive into a thin *69 and depressed market would have resulted in the estate being unable to receive the prevailing market price. As a result, it maintains that $4 a share is an appropriate valuation.This argument is based on the theory of blockage, recognized in the regulations, which permit valuation of large blocks of stock in accordance with the price available from sources outside the market in cases in which "the block to be valued is so large in relation to the actual sales on the existing market that it could not be liquidated in a reeasonable time without depressing the market." Section 20.2031-2(e), Estate Tax Regs. Respondent, on the other hand, maintains that the estate is not entitled to any blockage discount. We note at the outset that "blockage is not a rule of law, but a question of fact. If the price obtainable for a block of stock is influenced by the size of the block, the existence and extent of this influence must be proven." Estate of Christie v. Commissioner,T.C. Memo. 1974-95; Estate of Damon v. Commissioner,49 T.C. 108, 117 (1967). Upon careful consideration of the evidence presented and the testimony given by petitioner's expert, it is *70 our opinion that the Estate of Cecil H. Kopperman is entitled to a blockage discount which would result in a valuation of $4.25 a share on the alternate valuation date. Certain factors, we think, dictate such a result. First, the 1974 daily volume of trading in Progressive was 10% of the total number of shares held by decedent. Although it is true that 151,000 shares were traded in July, 1974, of which 100,972 and 38,860 shares were traded in the weeks ending July 19 and 26, respectively, only 300 shares were traded on the alternate valuation date. A large percentage of the July trading activity stemmed from Progressive Corporation's purchase program. In fact, if the block purchases made by Porgressive Corporation are subtracted from the 1974 annual trading volume figures, a mere 1,500 shares a day were traded. In the month of July, actual non-Progressive Corporation trades amounted to 30,000 shares or 1,500 a day. It is apparent then that Progressive Corporation's purchase of approximately 40% of all shares traded in 1974 put it in a dominant buying position. If we consider the relatively light trading activity, not counting Progressive Corporation's purchases, and the decline *71 of Progressive's price during 1974 to a low of $2.375 bid in November, 1974, the introduction of decedent's shares would have had a depressing effect upon the market price. We do not think that petitioner could have successfully sold all the shares at once or in a reasonable period of time without further depressing an already depressed market for such shares. As further evidence of a "blockage" factor, petitioner's expert testified as to the specific prices that the block purchaser, Progressive Corporation, was paying for the shares during the month of July. Four purchases by the block buyer were made in July at prices 1/4 to 3/8 below the reported asked prices, but above the reported bid price on the various dates of purchase.Petitioner's expert further testified that if Progressive Corporation paid McDonald & Co., a market maker in Progressive, $4.50 a share on July 24, when the reported asked price was $4.87 and the bid price $4.37, then subtracting the usual broker's margin or commission would result in the seller receiving $4 a share. This amount, $4, represents the bid price that the estate would receive from the broker if it sold decedent's shares through the usual market, *72 and assuming a uniform broker's commission of $.50 on each unit of stock. While we accept petitioner's contentions that some discount is appropriate, partially on the basis that Progressive Corporation was not paying the reported asked price, we cannot, in the absence of specific evidence of what the seller of the stock received, merely reduce the reported bid price by the same discount Progressive Corporation paid for its shares.Finally, we also note that petitioner and his expert both testified that Progressive Corporation was directly purchasing its own shares from Progressive security holders. Since petitioner was specifically aware of this purchase program, he might have been able to go outside the usual market and sell decedent's shares directly to Progressive Corporation at a price more favorable than a discounted bid figure. Accordingly, we conclude on this record that the Progressive stock owned by decedent at his death had a fair market value on the alternate valuation date of $4.25 per share, or a total of $114,962.50. To reflect the conceded issues and the adjustments required by our findings and conclusions, Decisions will be entered under Rule 155. Footnotes
1. All statutory references are to the Internal Revenue Code of 1954, as amended and in effect during the year in issue, unless otherwise indicated.↩
2. Sec. 2035. TRANSACTIONS IN CONTEMPLATION OF DEATH (a) GENERAL RULE.--The value of the gross estate shall include the value of all property to the extent of any interest therein of which the decedent has at any time made a transfer (except in case of a bona fide sale for an adequate and full consideration in money or money's worth), by trust or otherwise, in contemplation of his death. (b) APPLICATION OF GENERAL RULE.--If the decedent within a period of 3 years ending with the date of his death (except in case of a bona fide sale for an adequate and full consideration in money or money's worth) transferred an interest in property, relinquished a power, or exercised or released a general power of appointment, such transfer, relinquishment, exercise, or release shall, unless shown to the contrary, be deemed to have been made in contemplation of death within the meaning of this section and sections 2038 and 2041 (relating to revocable transfers and powers of appointment); but no such transfer, relinquishment, exercise, or release made before such 3-year period shall be treated as having been made in contemplation of death. Section 2035 was subsequently amended to include in the gross estate of decedents all property transferred by them after December 31, 1976, within three years of their death (with some exceptions) regardless of whether the transfer was in contemplation of death. Sec. 2001(a)(5), (d)(1), Tax Reform Act of 1976, Pub. L. 94-455, 90 Stat. 1848.↩