OMAN CONSTRUCTION COMPANY, INC., ET AL., [1] Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent OMAN CONSTR. CO. v. COMMISSIONER
Docket Nos. 578-76, 579-76, 580-76, 669-76, 803-76.
United States Tax Court
T.C. Memo 1978-484; 1978 Tax Ct. Memo LEXIS 31; 37 T.C.M. (CCH) 1849-57; December 5, 1978, Filed William Waller,James T. O'Hare, for the petitioners. John B. Harper, for the respondent. HALL MEMORANDUM FINDINGS OF FACT AND OPINION HALL, Judge: Respondent determined the following deficiencies in petitioners' income tax: A. Oman Construction Company, Inc. (Docket No. 578-76):
Taxable Year Ended
Deficiency
March 31, 1966
$ 35,011.75
March 31, 1967
33,493.22
March 31, 1968
106,229.67
March 31, 1969
925,359.74
March 31, 1970
712,748.21
March 31, 1973
12,302.66
B. Oman Investment Corporation (Docket No. 580-76):
Taxable Year Ended
Deficiency
January 1, 1971
$ 24,327.73
C. Stirton Oman and Frances A. Oman (Docket No. 803-76): Calendar Year
Deficiency
1965 $ 21,409.42
1966
5,711.92
1967
21,793.08
1968
1,282,251.77
1969
1,030,670.90
1970
870,343.54
*32 D. StirtonOman, Jr. and Linda B. Oman (Docket No. 579-76): Calendar Year
Deficiency
1968
$ 12,502.52
1969
7,412.11
1970
121,392.27
E. Jack A. Oman and Argie C. Oman (Docket No. 669-76): Calendar Year
Deficiency
1968
$ 11,148.30
1969
8,229.55
1970
134,576.11
A. Afghanistan Equipment
This case is primarily concerned with the tax treatment of the purchase and subsequent sales of construction equipment in Afghanistan. A brief synopsis of the facts is necessary for an understanding of the questions raised: Afghanistan Highway Constructors-HIQ ("AHC-HIQ"), a joint venture, owned equipment it had used in a road construction project in Afghanistan. Petitioner Oman Construction Company, Inc. ("Oman Corporation") was the managing joint venturer of AHC-HIQ; petitioner Stirton Oman ("Stirton") was the controlling shareholder of the Oman Corporation. In April 1968, when the construction project was winding down, Stirton contacted the other joint venturers and asked whether they were willing to sell this construction equipment. They all indicated they were. The equipment was ostensibly sold to the Oman Construction *33 Company, a partnership ("Oman Partnership"). The individual petitioners (Stirton, Stirton Oman, Jr. and Jack Oman) were partners in the Oman Partnership. The Oman Partnership sold some of this equipment from April 1968 until May 1969, at which time the remaining equipment was distributed to the partners who, in turn, contributed the equipment to Acme Investment Company ("Acme"), a partnership of which the individual petitioners were the sole partners. Acme sold the equipment immediately to Volunteer Enterprises, Ltd. ("Volunteer") which, in turn, sold the equipment to Mercury Company of Iran 8 months later. The first issue for decision is: 1. Whether the Oman Corporation or the Oman Partnership contracted to purchase the construction equipment from AHC-HIQ. If the Oman Corporation contracted to purchase the equipment, we must decide: (a) Whether the Oman Corporation purchased the equipment and then distributed it to Stirton (or the Oman Partnership) as a dividend; or (b) Whether the Oman Corporation distributed the contractual right to purchase this equipment to Stirton (or the Oman Partnership) as a dividend; or (c) Whether the Oman Corporation purchased and sold this *34 equipment (including the sale to Volunteer), and then distributed the proceeds of these sales as a dividend to Stirton. On the other hand, if the Oman Partnership purchased the equipment, we must decide: (d) Whether Acme received income in 1970 as a result of its sales of the equipment to Volunteer (specifically, whether this transaction was a bona fide installment sale); and (e) Whether the income of Acme should be reported on a calendar year or a fiscal year basis. B. Other Issues
2. What is the useful life of construction equipment (other than equipment purchased in Afghanistan) belonging to the Oman Partnership? 3. Are petitioners entitled to an award of attorneys' fees? FINDINGS OF FACT Many of the facts have been stipulated by the parties and are found accordingly. At the time they filed their petition, Stirton Oman ("Stirton") and his wife Frances resided in Brentwood, Tennessee. Stirton Oman died on March 18, 1977, and the First American National Bank, Nashville, Tennessee, is the executor of his petitioning estate. [2] Stirton Oman, Jr. ("Stirton Jr.") and his wife Linda were residents of Nashville, Tennessee, at the time they filed their petition. *35 Jack Oman ("Jack") and his wife Argie were residents of Brentwood, Tennessee, at the time they filed their petition. Frances, Linda and Argie Oman are parties only by virtue of having filed joint returns with their husbands during the years in issue. When we hereafter refer to petitioners, we will be referring to Stirton, Stirton Jr. and Jack. Oman Construction Company, Inc. ("Oman Corporation") is a Tennessee corporation organized in 1950. On the date its petition was filed, its principal offices were located in Nashville, Tennessee. Oman Investment Corporation is a Tennessee corporation organized in 1970; on the date its petition was filed, its principal office was located in Nashville, Tennessee. Oman Corporation was in the heavy construction business. Among other things, it built highways, railroads, airports, bridges, pipelines, tunnels, dams and missile bases. It obtained contracts principally by competitive bidding on a lump sum or fixed price basis; it did practically no subcontracting of work to others. A brief history of the Oman Corporation and the Oman *36 Partnership follows: In 1938 John Oman, Jr. formed Oman Construction Company, a partnership, with his two sons, John Oman III and Stirton. After John Oman, Jr. died, his sons transferred some of the assets of the Oman Construction Company to the newly formed Oman Corporation. The remaining assets were retained by a new partnership, also called Oman Construction Company ("Oman Partnership"). After its formation, the Oman Corporation entered into all new construction contracts. After John Oman III's death in 1960, Stirton owned a controlling interest in Oman Corporation until his death in 1977. Until 1969 he owned slightly more than 80 percent of the shares of Oman Corporation; the remainder were owned by an unrelated individual, Jack Massey. In 1969 Stirton Jr. and Jack Oman acquired a few shares from their father; in 1970 and 1971 they acquired additional shares from their father as well as the shares previously owned by Jack Massey.
Prior to 1965 Stirton Jr. and Jack Oman each had a one percent interest in the Oman Partnership; effective January 1, 1968, Jack Oman and Stirton Jr. each acquired a 20 percent interest in the partnership. The remaining interest in the Oman *37 Partnership belonged (after the death of John Oman, III in 1960) to Stirton. The Oman Partnership was primarily in the business of leasing heavy construction equipment. [3] *38 Since 1960, the Oman Partnership has rented equipment only to the Oman Corporation. The equipment was rented on an annual net rental basis; repairs were made by the Oman Corporation at its own expense. The equipment leased to the Oman Corporation by the Oman Partnership was numbered serially with equipment owned by the Oman Corporation. The owner of each item was designated on equipment lists containing all the serially numbered items. Separate equipment ledgers were maintained by the Oman Corporation and the Oman Partnership. All equipment, whether owned by the Oman Partnership or the Oman Corporation, had only the name "Oman" on it. The records of the Oman Corporation and the Oman Partnership were kept separately, although the two businesses shared the same offices and Oman Partnership records were maintained by corporate employees without charge. [4]
A. Afghanistan Equipment
In August 1966 the Oman Corporation entered into a joint venture known as "Afghanistan Highway Constructors-HIQ" ("AHC-HIQ") with five other corporations. The purpose of this joint venture was to construct the Herat-Islam Qala highway in Afghanistan. Eventually one of the joint venturers withdrew, leaving the Oman Corporation, J. A. Jones Construction Company, Peter Kiewit and Sons Co., Morrison-Knudsen International Company, Inc., and Wright Contracting Company, Inc. as joint venturers. As amended, the joint venture agreement provided that profits, obligations, liabilities and the interests of the joint venturers in acquired property and equipment would be divided as follows: Oman
25%
Wright
20%
Morrison-Knudsen
35%
Kiewit
10%
Jones
10%
Oman Corporation was the sponsoring and managing partner of the joint venture. Prior to the AHC-HIQ joint venture, the Oman Corporation was a joint venturer in another road construction project *39 in Afghanistan. This joint venture, Afghanistan Highway Constructors ("AHC"), was formed in 1961 to construct the Kandahar-Kabul highway. When construction of the Kandahar-Kabul highway was completed, AHC-HIQ purchased the equipment of AHC at its book value of approximately $497,000. AHC-HIQ also purchased other equipment and used substantial amounts of equipment provided by the Government of the United States. AHC-HIQ completed construction of the Herat-Islam Qala road in 1967. After construction was completed, AHC-HIQ sold some of the equipment (with an aggregate book value of $520.08) for $27,238.35. As of April 30, 1968, AHC-HIQ had on hand equipment with a book value of $62,786.65. [5]
In April 1968 Stirton contacted the other joint venturers to inquire whether they would be willing to sell the remaining equipment at book value. Since the other joint venturers had previously experienced losses disposing of equipment overseas, [6] they were eager to sell the equipment at book value. This was especially *40 true in the case of equipment in Afghanistan, a land-locked country which was not adjacent to any countries with likely purchasers. The only neighboring country in which there might have been a market for equipment was Iran, but Iran had a law prohibiting importation of used equipment. Accordingly, the other joint venturers were willing to sell the equipment to anyone who would pay book value for it. On April 30, 1968, the Oman Partnership purchased the remaining construction equipment [7] from AHC-HIQ for its book value of $62,786.65. AHC-HIQ continued to make repairs to this equipment, which repairs were charged to the Oman Partnership. AHC-HIQ also continued to insure the equipment. *41 During 1968 the Oman Partnership sold part of the equipment for $500,362.09. Between January 1 and May 8, 1969 the Oman Partnership sold additional equipment and supplies for $128,529.58. AHC-HIQ prepared the journal vouchers showing the sale of this equipment. Some of these vouchers indicated that the equipment sold belonged to Oman Construction Company [the partnership]; others indicated that the equipment belonged to Oman Construction Company, Inc. [Oman Corporation]. The vouchers indicating the equipment belonged to the Oman Corporation, however, were not signed by the office manager. All the vouchers contained the notation, "AP-5," which was the account number for the Oman Partnership. The vouchers indicating that the equipment belonged to the Oman Corporation were prepared by Afghan employees who were not aware of the existence of two separate companies. On May 8, 1969, the Oman Partnership distributed the remaining equipment to its three partners, Stirton, Stirton Jr. and Jack, as tenants in common, in the proportions of 60 percent, 20 percent, and 20 percent, respectively, which were the same proportions as their interests in the partnership. The following day *42 Stirton, Stirton Jr. and Jack transferred their right, title and interest in the equipment to Acme Investment Company, a partnership ("Acme"). [8]Acme filed income tax returns on a fiscal year basis. On May 13, 1969, Acme sold the remaining equipment to Volunteer Enterprises, Ltd. ("Volunteer"), a Bahamian corporation. Volunteer was incorporated in December 1968. Most of the stockholders of Volunteer were Oman employees, but Stirton, Stirton Jr. and Jack were never directors, officers or shareholders of Volunteer. Volunteer was under the complete control and management of James Sumner and Frank Reed, who were the officers and directors of the corporation. Although Reed and Sumner had previously been associated with the *43 Oman companies and their joint ventures, Volunteer was not a "tool" of Oman Corporation, Oman Partnership or Acme in any way. [9]
The sale of the remaining AHC-HIQ equipment by Acme to Volunteer was an installment sale. Acme received a promissory note for $1,000,000 plus 75 percent of any amount over $1,000,000 which Volunteer received on resale of the equipment. Payments of principal on the note were not due until June 1977. Reed believed that this sale would be profitable to Volunteer since, if Volunteer could resell the equipment quickly for more than it paid for the equipment, Volunteer could invest the proceeds of the sale for *44 several years and profit thereby. At the time Volunteer purchased the equipment from Acme, the officers of Volunteer did not know Mercury Company of Iran would want to buy the equipment. On January 23, 1970, Volunteer sold the equipment to Mercury Company. Although the original contract provided a selling price of $1,500,000, this was subsequently reduced to $1,200,000 and, eventually, approximately $1,100,000 was received by Volunteer. The sales contract provided that AHC was the "seller" of the equipment and that the seller agreed to deliver the equipment to the Iranian border. [10] The promissory note issued by Mercury, however, indicated that AHC was acting only as an agent for Volunteer in this transaction. In reality, AHC was listed as the "seller" of the equipment only to avoid the payment of taxes, duties, and license fees which would have otherwise accrued if the equipment had been sold by any other party. Under the conditions of the contract pursuant to which AHC brought the equipment into Afghanistan, AHC was exempted from such imposts. *45 Originally Sumner and Reed had hoped that Volunteer could use the sales proceeds to finance Kentucky Fried Chicken franchises in Europe. This investment, however, did not materialize. Eventually the majority of the proceeds were loaned to a New York brokerage firm which later went bankrupt. Volunteer also ran a scuba diving school which foundered. As a result, Volunteer lost all the money it had received from the equipment sale. Eventually Volunteer declared insolvency and assigned all its assets to Acme, its sole creditor. Acme experienced almost a total loss on its sale of the equipment to Volunteer; the only payments which Acme received were interest payments totaling $155,000 received in 1969 through 1972. On its income tax returns for 1968 and 1969 the Oman Partnership reported the profit it made on the various sales of the equipment from April 30, 1968 to May 8, 1969. This profit was reported as income by the three partners of the Oman Partnership in accordance with their respective interests in the partnership. Neither Acme nor the individual petitioners reported any profit on the sale of equipment to the Mercury Company because no principal payments were made under *46 the installment sales contract. In the statutory notices respondent determined, first, that the profits reported by the Oman Partnership from sales of the AHC-HIQ equipment should have been reported by the Oman Corporation since the corporation was the "actual owner" of the equipment. Pursuant to this determination, respondent increased the corporation's taxable income by $420,976.70 for the year ended March 31, 1969, and $106,228.40 for the year ended March 31, 1970, to reflect the sales of equipment prior to the transfer of the remaining equipment to Acme on May 9, 1969. Respondent further determined that Oman Corporation sold the equipment to Mercury Company on January 23, 1970 and, accordingly, respondent increased the corporation's income by $1,148,543.22 for the fiscal year ended March 31, 1970. This determination reflects respondent's disallowance of installment sale treatment on this transaction. Respondent determined, second, that Stirton received divided income from the above transactions. Specifically, respondent determined that Stirton received constructive dividends in the amounts of $562,353.86 in 1968 and $255,715.01 in 1969. The foundation of respondent's *47 determinations was that respondent considered the Oman Partnership to be a "sham." Of these amounts, $420,976.70 in 1968 and $106,228.40 in 1969 represent the profits from the sales of the AHC-HIQ equipment. Respondent further determined that Stirton received a constructive dividend of $1,200,000 in 1969 from the sale of the equipment to Mercury Company. [11] Subsequently, respondent reduced this amount to $1,147,179.22 to reflect the stock ownership of Stirton Jr. and Jack and to give Stirton credit for $51,456.78 which respondent determined was constructively contributed by him to the corporation to acquire the equipment from AHC-HIQ. In an amendment to his answer, respondent took the alternative position that Stirton's income for 1968 should be increased by $1,829,891.67 to account for an "in-kind constructive dividend" from the Oman Corporation. Respondent contends that this dividend consisted of a distribution of the AHC-HIQ equipment. On brief respondent corrected mathematical errors and reduced this amount to $1,766,115.12. In amendments to his answer, respondent took the position *48 that in 1970 Stirton Jr. and Jack received constructive dividends of $682 each, representing their proportionate shares of the proceeds of the "sale" of AHC-HIQ equipment by the Oman Corporation to Mercury Company. Respondent further determined that Acme had no income in 1969 and 1970 since this income was actually earned by the Oman Corporation. Alternatively, respondent determined that Acme received payment of $1,150,000 in 1970 from the sale of the AHC-HIQ equipment. The basis for this determination was that the sale was not a bona fide installment sale.Respondent also determined that the income of Acme should be reported on a calendar year, rather than a fiscal year, basis. B. Other Issues
In 1958 the Oman Partnership, the Oman Corporation and respondent reached an agreement whereby the taxpayers agreed to depreciate crawler-type equipment over a four-year useful life and to depreciate rubber-tired and other larger items of equipment (e.g., cranes) over a five-year life. In 1962 the Oman Corporation adopted the Asset Guideline Class method of depreciation which went into effect in that year; the Oman Partnership continued to use the previously-agreed method of depreciation. *49 Under the asset guidelines in effect at that time, five years was the suggested life for construction equipment. For its fiscal year ended March 31, 1969, the Oman Corporation increased the useful lives of certain equipment [12] from five to six years.
In his statutory notice, respondent determined that the construction equipment belonging to the Oman Partnership and leased to the Oman Corporation had a useful life of six years. In his answer, respondent amplified that the basis for this determination was respondent's further determination that the Oman Corporation and the Oman Partnership were "one and the same." On brief, petitioners requested an award of attorney's fees. OPINION A. Afghanistan Equipment
The first issue for decision concerns the purchase and sale of equipment used by the Afghanistan Highway Constructors-HIQ ("AHC-HIQ") joint venture. The details of this transaction have been set forth in our Findings of Fact; a brief summary follows: AHC-HIQ owned equipment it had used in a road construction project in Afghanistan. Oman Construction Company, Inc. ("Oman Corporation") *50 was the managing joint venturer of AHC-HIQ; StirtonOman ("Stirton") was the controlling shareholder of Oman Corporation. In April 1968, when the construction project was winding down, Stirton contacted the other joint venturers and asked whether they were willing to sell this equipment for book value. They all agreed; in fact, they were eager to sell the equipment to anyone who would buy it. The equipment was sold by AHC-HIQ to the Oman Construction Company, a partnership ("Oman Partnership") in which Stirton, Stirton Oman, Jr. ("Stirton Jr.") and Jack Oman ("Jack") had, respectively, interests of 60 percent, 20 percent and 20 percent. Oman Partnership owned considerable amounts of other equipment which it leased to the Oman Corporation. After profitably selling some of the equipment it had purchased from AHC-HIQ, in May 1969 the Oman Partnership distributed the remaining AHC-HIQ equipment to its partners who, in turn, contributed the equipment to a new partnership, Acme Investment Company ("Acme"). Acme then sold the equipment to Volunteer Enterprises, Ltd. ("Volunteer"), a Bahamian corporation whose shareholders were primarily Oman employees. The Omans, however, had no control *51 over Volunteer. This sale--Acme to Volunteer--was an installment sale; payments of principal were not due until 1977. In 1970 Volunteer sold the equipment to Mercury Company of Iran for a profit, but these profits were subsequently lost by Volunteer in bad investments. Eventually Volunteer defaulted on its obligation to Acme. Respondent's determinations recast the form of these transactions. Basically, respondent determined that the Oman Corporation, not the Oman Partnership, purchased the equipment from AHC-HIQ. Accordingly, respondent determined that gain from subsequent sales of the equipment should be reported as corporate income and as constructive dividends to the individual petitioners. Alternatively, respondent determined that the Oman Corporation distributed the equipment to the Omans as an in-kind constructive dividend. In addition, respondent determined that the installment sale by Acme to Volunteer was not bona fide and, accordingly, the income from this sale should be reported in its entirety in the year the sale was made rather than pursuant to the installment method. We believe that this entire litigation makes sense only in light of respondent's original *52 thesis. Originally respondent took the position that the Oman Partnership was, in respondent's words, a "sham." Respondent's position is set forth in his answers to petitioners' interrogatories: Respondent determined that Oman Construction Company, a purported partnership, lacked economic reality (as well as a business purpose) because the partnership was a sham. Oman Construction Company, Inc., and the partnership were owned and operated by the same individuals. The two companies operated out of the same offices with the same employees and facilities. * * * No significant differentiation was made between corporate equipment and partnership equipment. * * * * * * Because the partnership should not be recognized, any purchases and sales of the Afghanistan equipment must be taken into account for federal tax purposes by the corporation, the true owner of the equipment for federal tax purposes. * * * Documents of title or similar documents indicating that the purported partnership was the owner of the equipment were determined by respondent to be insignificant for federal tax purposes. On brief respondent conceded that the Oman Partnership was not a sham. Nevertheless, respondent *53 still maintains that the Oman Corporation purchased the equipment from AHC-HIQ; respondent argues, accordingly, that the corporation received income (and petitioners received constructive dividends) as a result of this transaction. Petitioners contend that respondent's determinations are "mainly imaginative fiction." The question presented are purely factual, and the burden of proof is on petitioners. Rule 142(a), Tax Court Rules of Practice and Procedure. Based on the record, we conclude that respondent's position is completely without merit. Respondent contends, first and foremost, that the Oman Corporation contracted to purchase the construction equipment from AHC-HIQ. All of respondent's other determinations with respect to the purchase and sale of this equipment are derived from this basic contention. We find no support for respondent's position in the record of this case; in fact, the evidence (including the testimony of respondent's witness) all supports petitioners' contention that the Oman Partnership purchased the equipment. At the threshold we note that the Oman Partnership was a longstanding, ongoing valid business. In structuring the sale of equipment to the *54 Oman Partnership rather than the Oman Corporation, petitioners no doubt arranged the transaction so as to minimize their taxes. This they are allowed to do. Estate of Stranahan v. Commissioner,472 F. 2d 867, 869 (6th Cir. 1973). To be a sale for tax purposes, however, a transaction must be a sale in substance, not merely in form. In this case we conclude that the sale of the equipment by AHC-HIQ to the Oman Partnership meets that requirement. All the documentary evidence indicates, as petitioners contend, that the Oman Partnership purchased this equipment. Some invoices by AHC-HIQ for repairs after the sale indicate that the equipment belonged to Oman Corporation; all these invoices, however, contained the billing number for the Oman Partnership. Since these invoices were not signed by the office manager (and all invoices signed by the office manager indicated that the equipment belonged to the Oman Partnership), we conclude that the invoices indicating that the equipment belonged to the corporation were prepared by Afghan employees who were not aware of the existence *55 of the two entities and did not belie the purchase by the Oman Partnership. In addition, the testimony of the witnesses does not aid respondent.Specifically, two of the individuals whom Stirton Oman contacted testified that Stirton simply inquired whether they were willing to sell the equipment for book value--neither testified that Stirton inquired whether they would be willing to sell the equipment to the Oman Corporation. [13] In fact, as both witnesses testified, they were willing to sell the equipment to anyone who would pay book value. In short, there is no evidence in the record to support respondent's contention that the other joint ventures contracted to sell the equipment to the Oman Corporation. We conclude that the evidence presented overshelmingly supports petitioner's contention that AHC-HIQ contracted to sell--and did sell--the equipment to the Oman Partnership. On the basis of this conclusion, respondent's other contentions with respect to a constructive dividend fall of their own weight. Specifically, the Oman Corporation did not distribute either the *56 equipment (as an in-kind dividend) or the contract right to purchase it, since the Oman Corporation never possessed either of these items. Similarly, the Oman Corporation did not realize any gain on the sale of some of this equipment (prior to May 9, 1969) since the Oman Partnership owned and sold the equipment. [14] Finally, the Oman Corporation could not have realized income through the sale of the rest of the equipment to the Mercury Company in 1970 since the Oman Corporation never owned the equipment. As to the installment sale between Acme and Volunteer, respondent determined that this was not a bona fide installment sale. On brief respondent contended, first, that the installment sale was a loan and, second, that Acme constructively received the proceeds of the sale since the Omas "had the power to call the shots with respect to [Volunteer]." Respondent's second contention is completely unsupported by the record of this case. The Omans were never directors, officers or shareholders of Volunteer. The secretary-treasurer of Volunteer testified *57 specifically and convincingly that Volunteer was not a "tool" of either Oman Company or Acme "in any sense, shape or form." Similarly, Volunteer's president, Sumner, testified with respect to Volunteer that "Frank Reed and I pretty well ran that show." On the basis of this uncontradicted, credible evidence and the record as a whole we reject respondent's contention that Acme constructively received the proceeds of the sale of the equipment to Mercury Company. Respondent's other contention with respect to the Acme-Volunteer sale is that the transaction was, in fact, a loan to Volunteer (whose shareholders were primarily, though not exclusively, Oman employees). In support of this contention respondent relies on the "fact" that the Omans "entered into the purported installment sale * * * with the knowledge and understanding that [Volunteer] would resell the equipment to an unrelated purchaser at approximately the same price paid for it, receive a note requiring payment for the property in a relatively short time, and invest the proceeds on a long-term basis. The substance of the transaction was that in 1970 [Volunteer] merely acted as the agent of Acme in selling the equipment *58 * * *." Respondent also refers to Rushing v. Commissioner,441 F. 2d 593 (5th Cir. 1971). In that case, the Fifth Circuit stated that a taxpayer may not receive the benefit of the installment sales provision if the seller directly or indirectly has control over the proceeds of the sale or possesses the economic benefit therefrom. 441 F. 2d at 598. Once again we conclude that the evidence does not support respondent's position. In the first place, at the time Volunteer purchased the equipment it had no knowledge that it would be able to sell the equipment to Mercury Company. We reach this factual conclusion on the basis of (1) the uncontradicted credible testimony to that effect and (2) the lengthy time interval (over 8 months) between the sale to Volunteer and the resale to Mercury Company. Second, the evidence does not support the conclusion that this transaction was simply a disguised loan. Again, several factors lead us to our conclusion: (1) Volunteer was not controlled by the Omas; (2) several of the shareholders of Volunteer were not Oman employees; and (3) the Omans and Acme received a tangible benefit from the sale in that the onus of *59 selling equipment in Afghanistan, which was a heavy burden, was taken from their shoulders and assumed by Reed and Sumner. Finally, the test presented in Rushing v. Commissioner,supra, supports petitioners', not respondent's, position. In that case the Fifth Circuit specifically stated that "a taxpayer may, if he chooses, reap the tax advantages of the installment sales provision if he actually carries through an installment sale * * *." An installment sale is recognized unless the seller directly or indirectly controls or receives the economic benefit of the proceeds of the sale. 441 F. 2d at 598. In this case, Acme neither controlled the proceeds (since Volunteer was not controlled by the Omans) nor directly received the benefits from the sale (since Volunteer lost all it realized in the sale). [15] We conclude that the installment sale was bona fide and, accordingly, that Acme properly did not report income from that sale in 1970, the year of the sale. [16]
*60 We now turn to the next issue, namely, whether Acme must report its income on a calendar year basis, as respondent determined.Although a partnership may, as petitioners contend, adopt a taxable year other than a calendar year, a partnership may not adopt a taxable year other than the taxable year of all of its partners (or a calendar year) without prior approval from respondent. Section 1.706-1(b)(1)(ii), Income Tax Regs. Since petitioners did not present any evidence that they sought or obtained such approval in this case, we must sustain respondent's determination that Acme must report its income on a calendar year basis. B. Other Issues
The next issue concerns the useful life of equipment belonging to the Oman Partnership. Respondent determined that the useful life of this equipment was six years, instead of the four or five-year useful lives which the Oman Partnership claimed. On brief respondent contends that petitioners did not prove the useful lives of the equipment involved. We conclude, however, that the burden of proof with respect to this *61 issue is on respondent and that respondent failed to meet his burden. In 1958 petitioners and respondent reached an agreement as to the useful lives of the equipment involved; Oman Partnership has complied with this agreement ever since. In 1962, however, the Oman Corporation switched from the agreed useful lives to the Asset Guideline Class method of depreciation, and respondent now seeks to apply the same useful lives adopted by the Oman Corporation to the equipment belonging to the Oman Partnership. The basis of respondent's determination, as outlined in his answer, was that the partnership was a "sham." Respondent similarly contended at trial that the basis of his determination was that the equipment should be treated the same whether owned by the partnership or the corporation. After trial respondent conceded that the Oman Partnership was not a sham, but on brief respondent argues that petitioners have not proved the useful lives of the equipment. We conclude that respondent's position on brief constitutes a "new matter" on which respondent has the burden of proof. Specifically, the evidence needed to contradict respondent's current position--specific evidence as to the *62 useful lives of the partnership's equipment--is different than the evidence required to meet the position taken by respondent prior to and at trial--that the Oman Partnership was not a sham. See Estate of Falese v. Commissioner,58 T.C. 895, 899 (1972). Turning to the evidence presented at trial, we conclude that respondent failed to carry his burden of proof. Neither party introduced any evidence as to the useful lives of the equipment involved. Respondent's determination rests solely on the grounds that the Oman Corporation has adopted a six-year useful life for similar equipment; respondent relies on this fact as proof of its position that the equipment has, in fact, a useful life of six years. Petitioners, on the other hand, point to the agreement reached by the parties in 1958 in which a useful life of 4 years for crawler-type equipment and 5 years for other equipment was agreed to. In light of this limited evidence of useful life, we conclude that the party who bears the burden of proof--in this case, respondent--loses. Respondent has failed to convince us that the useful life adopted by the corporation is more accurate than that to which the parties had *63 previously agreed. Accordingly, we reject respondent's determination. The final issue in this case is whether petitioners are entitled to attorneys' fees. While we are sympathetic to petitioners' position--this case required protracted and expensive litigation due to a determination which was, basically, unmeritorious--this Court lacks the jurisdiction to award attorneys' fees to petitioners. Key Buick Co. v. Commissioner,68 T.C. 178 (1977). To reflect the foregoing, Decision will be entered under Rule 155. Footnotes
1. The following cases have been consolidated for purposes of trial, briefing and opinion: Stirton Oman, Jr. and Linda B. Oman, Docket No. 579-76; Oman Investment Corporation, Docket No. 580-76; Jack A. Oman and Argie C. Oman, Docket No. 669-76; and Estate of Stirton Oman, Deceased, First American National Bank of Nashville, Executor, and Frances A. Oman, Docket No. 803-76.↩
2. By order dated April 2, 1977, the Estate of Stirton Oman was substituted as a party in this case.↩
3. Oman Partnership held heavy construction equipment during the years in issue with a cost or other basis (before depreciation) as follows: ↩ Date
Basis
12-31-64
$ 693,376.89
12-31-65
633,605.46
12-31-66
610,664.62
12-31-67
652,496.96
12-31-68
725,232.76
12-31-69
725,181.86
12-31-70
724,554.87
12-31-71
692,101.71
4. The rent charged Oman Corporation was slightly below the going rate to compensate Oman Corporation for accounting and other services rendered Oman Partnership by Oman Corporation employees.↩
5. This figure does not↩ include equipment which had been provided by the Government of the United States. The Government's equipment was returned to it in 1968.
6. For example, Mr. Jones, the president of J. A. Jones Construction Co., testified about the losses his company incurred selling equipment after the completion of a project in Iraq, and Mr. Greenleaf of Morrison-Knudsen explained that his company had previously shipped equipment overland from Iran to Lebanon, only to have to sell the equipment at a loss.↩
7. The equipment purchased included, among other things, air compressors, concrete laying and finishing equipment, conveyors, loaders, scrapers, motor graders and cranes, dump trucks, tractor trailers, bulldozers, welders, pumps, tankers and an airplane.↩
8. Stirton, Stirton Jr. and Jack had interests, respectively, of 57 percent, 19 percent and 19 percent in Acme; the remaining 5 percent of Acme was owned by Oman Investment Corporation. Since the three Omans owned stock of Oman Investment Corporation in the proportion of 60 percent for Stirton, 20 percent for Stirton Jr. and 20 percent for Jack, their total ownership of Acme was in the same proportions as their ownership of the Oman Partnership in 1968.↩
9. Volunteer had had dealings with the Oman Partnership prior to Volunteer's purchase of the AHC-HIQ equipment in May 1969. On October 20, 1969, Volunteer submitted a statement to the Oman Partnership for a sales commission earned, pursuant to an oral agreement, in connection with a sale of equipment prior to May 8, 1969. As was mentioned previously, in 1969 Oman Partnership sold equipment for a total price of $128,529.58; Volunteer received a 10 percent commission on $103,923.74 of these sales since its president, Sumner, arranged the sales.↩
10. Since Iranian law prohibited the importation of used equipment, the transfer of the equipment took place in the no-man's land at the Afghanistan-Iran border; it was Sumner's responsibility to get the equipment out of Afghanistan, and Mercury's to get it into Iran.↩
11. Respondent made an identical adjustment for 1970 in order to protect his position.↩
12. Rear dumps, motor graders, backhoes, tractors, bulldozers and welders.↩
13. Unfortunately we lack the testimony of Stirton Oman, since he died before the trial of this case.↩
14. We note that the partners of the Oman Partnership fully reported the gain realized through the sale of this equipment.↩
15. Although it could be argued that the Omans benefited economically from this installment sale since some of their employees received the use of the profits, if any, for several years, we believe that this indirect benefit does not disqualify this installment sale. The benefit to the employees was uncertain.Their gain was contingent upon their ability to resell the equipment (an iffy proposition, as the testimony of the other joint venturers indicates) and successfully reinvest the proceeds. In the meantime, they owed (and paid) interest to Acme. In light of these facts, we conclude that any benefit to the Omans from the installment sale structure of this transaction (other than tax benefits) was, at best, sufficiently tangential that the installment sale should not be disregarded for tax purposes. ↩
16. Respondent does not rely on the partially indefinite nature of the purchase price to defeat the installment election. See Gralapp v. United States,458 F. 2d 1158 (10th Cir. 1972). In view of his failure to raise the issue, we need not decide what effect the Gralapp doctrine would have on an attempted installment election here, nor whether this case is appropriate for application of Burnet v. Logan,283 U.S. 404↩ (1931).