ROBERT D. WRAY and BARBARA D. WRAY; and KIRK I. PIERCE and SANDRA PIERCE, Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent
WRAY v. COMMISSIONER
Docket No. 2253-77.
United States Tax Court
T.C. Memo 1978-488; 1978 Tax Ct. Memo LEXIS 24; 37 T.C.M. (CCH) 1849-81; December 11, 1978, Filed *24 Michel G. Emmanuel and J. Baird Lefter, for the petitioners. Lewis J. Hubbard, Jr., for the respondent SCOTT MEMORANDUM FINDINGS OF FACT AND OPINION SCOTT, Judge: Respondent determined deficiencies in petitioners' Federal income taxes as follows: Petitioners
Year
Deficiency
Robert D. Wray and
Barbara D. Wray
1973
$ 37,543.93
Kirk I. Pierce and
Sandra Pierce
1972
10,376.85 The issues for decision are: (1) Whether respondent is barred by the statute of limitations from assessing any income tax deficiency for the calendar year 1972 against Kirk I. Pierce and Sandra Pierce; (2) whether the decision entered in the case of Robert D. Wray and Barbara D. Wray, et al. v. Commissioner, Docket No. 974-75, is res judicata as to the tax liability for the calendar year 1972 of Kirk I. Pierce and Sandra Pierce; (3) whether respondent is collaterally estopped from assessing an income tax deficiency against Robert D. Wray and Barbara D. Wray for the calendar year 1973; (4) whether respondent is collaterally estopped from assessing an income tax deficiency against Kirk I. Pierce and Sandra Pierce for the calendar year 1972; (5) whether the corporate entity of Reiman Enterprises, Inc., should be disregarded, *25 or in the alternative whether Reiman Enterprises, Inc. should be treated as the agent of the Tanglewood partnership, with respect to the sale of real estate to M. J. Brock and Sons, Inc.; (6) whether the real estate sold to M. J. Brock and Sons, Inc., was held by the Tanglewood partnership primarily for sale to customers in the ordinary course of its trade or business; and (7) whether petitioners are entitled to reimbursement for attorneys' fees and out-of-pocket expenses paid in connection with their defense against deficiencies asserted against them in this case and in Robert D. Wray and Barbara D. Wray, et al. v. Commissioner, Docket No. 974-75. FINDINGS OF FACT Some of the facts have been stipulated and are found accordingly. Petitioners Robert D. Wray and Barbara D. Wray, who resided in St. Petersburg, Florida, at the time of the filing of their petition in this case, filed a timely joint Federal income tax return for the calendar year 1973 with the Internal Revenue Service Center in Chamblee, Georgia. Petitioners Kirk I. Pierce and Sandra Pierce, who resided in Seminole, Florida, at the time of the filing of their petition in this case, filed a timely joint Federal income *26 tax return for the calendar year 1972 with the Internal Revenue Service Center in Chamblee, Georgia. Petitioner Robert D. Wray is a lifetime resident of St. Petersburg, Florida. After graduating from high school, Mr. Wray attended night school for 5 years and was trained as an electrician. After working for a number of years as an electrician on the construction of single family homes, shopping centers, hospitals and the like, Mr. Wray formed Robert D. Wray Construction Company (hereinafter the "Company"). The Company was an electing small business corporation under section 1371(b), I.R.C. 1954, [1] for the years here in issue. Shareholders of all the issued and outstanding stock of the Company during the periods in issue were as follows: Number and Percentage Name of Shareholder
of Shares Owned
Robert D. Wray
231
46.2
Barbara D. Wray
230
46
Barbara D. Wray as custodian
for Mark D. Wray, a minor
13
2.6
Barbara D. Wray as custodian
for Rhonda D. Wray, a minor
13
2.6
Barbara D. Wray as custodian
for Risa D. Wray, a minor
13
2.6
Total
500
100
Mr. Wray and his *27 wife were officers, directors and employees of the Company. The children did not actively participate in the business affairs of the Company. The Company began its operations by purchasing a few lots in a development known as the Ponderosa development, developing these lots, constructing houses on these lots, and selling the houses. The Company then purchased more lots which were developed and on which it constructed houses that were then sold. The Company continued this work in the Ponderosa project until 1969 when that project was nearing completion. Thereafter the principal business of the Company continued to be the development of lots and the construction of single family houses which it sold. Mr. Wray drew the plans for the houses built by the Company and was in charge of building the houses. His wife, Barbara D. Wray, acted as bookkeeper and was responsible for keeping cost records on each house built. [2] *28 She made out the payroll and scheduled the subcontractors. Additionally, landscape and interior design were under her supervision. The Ponderosa project was successful and as Mr. Wray began to accumulate cash he invested in the stock market. Eventually, he was convinced by friends whose knowledge in such matters he respected that it was time to take his money out of the stock market and to purchase land. Accordingly in 1969, he liquidated his stock holdings. Soon after selling his stock, Mr. Wray and the Company began purchasing undeveloped land on Tampa Bay in St. Petersburg, Florida. Mr. Wray had been interested in this land since at least 1968. In October and November of 1969, Mr. Wray and his Company purchased 3 tracts of this land: The Upham tract (around 55 acres), Mastry tract (around 3 acres) and the Roby tract (around 3 acres). [3] *29 The Company decided that single family housing would be appropriate for the Roby and Mastry properties and for what is approximately the eastern 3/4 of the Upham property. This land was located on Pappy's Bayou; thus, single family homes could for the most part be located on waterfront property. Additionally, St. Petersburg was traditionally a good market for single family homes. The Company made no initial decision on how the western portion of the Upham tract should be developed. This property was located about 3/4 a mile from the Ponderosa development. Mr. Wray had confidence that as a land developer he could find an appropriate use for the western portion of the Upham tract. The Company hired George F. Young, Incorporated to do the necessary civil engineering and surveying for a single family project to be undertaken on the Upham, Roby and Mastry tracts. The president of George F. Young, Incorporated was Lewis H. Kent, with whom Mr. Wray had attended high school *30 in the 1950's and who upon selling the Company two of the lots for the Ponderosa project had renewed his acquaintance with Mr. Wray. Mr. Kent is a graduate of the University of Florida School of Engineering. George F. Young, Incorporated soon pointed out to the officers of the Company that the southern tip of the Upham tract did not reach the water and therefore, the access of 3 lots to water was impaired. The engineers suggested that the Company could solve this by purchasing a small piece of land to the south of the Upham tract. The owner of that land, the Arnold tract, however, insisted that his entire property would have to be sold as a package. The Arnold tract consisted of around 15 acres to the south of the Upham tract. At this point, Mr. Wray contacted Mr. Kent and inquired about the possibility of Mr. Kent investing in the project. Mr. Wray initially wanted Mr. Kent to purchase the Arnold tract. Mr. Kent, however, preferred an interest in the whole project. In late 1969 or early 1970, Mr. Kent's offer to purchase an interest in the entire project was orally accepted. In January of 1970, Mr. Wray purchased the Arnold tract. Early in 1970, Kirk I. Pierce agreed to invest *31 in the project. Mr. Pierce was in the earth moving business and had been hired by the Company to clear the initial survey paths for the project and then to clear the land. Since he did not have enough available cash, Mr. Pierce agreed orally to pay for an interest in the project by use of his earth moving equipment in its development. In March of 1970, the Church tract was purchased by the Company. It was located southeast of the Arnold tract. Development of the project had begun and Mr. Pierce was using his earth moving equipment in the development of this project. Mr. Kent made the following cash payments into the partnership consisting of the Company, Mr. Pierce and himself which was being formed to acquire and develop the various tracts: (1) $9,000 on April 1, 1970; (2) $9,000 on April 13, 1970; (3) $6,000 on May 12, 1970; and, (4) $6,000 on May 18, 1970, for a total of $30,000. On May 18, 1970, Messers. Wray, Pierce and Kent and the Company entered into a written agreement concerning the 78.5 acres which had been acquired. The agreement resulted in an entity known as the Tanglewood Joint Venture (hereinafter the "Partnership"). [4] The agreement formalized the previous oral *32 understandings between the parties. Mr. Kent was to contribute $30,000 in cash; Mr. Pierce was to contribute $30,000 worth of equipment rentals; the Company was to contribute the 78.5 acres and all development costs [5] *33 above the $60,000 investment of Messers. Pierce and Kent. Mr. Wray was required to transfer the Arnold and Mastry tracts held in his and his wife's name to the Company. Mr. Wray as president of the Company was given complete control over the Partnership, its Tanglewood project and the 78.5 acres of land. The Company was to recover all of its development and land costs above $90,000 before either Mr. Kent or Mr. Pierce would receive any return from his investment and all dollars thereafter available were to be divided 20 percent each for Mr. Kent and Mr. Pierce and 60 percent for the Company. Mr. Kent and Mr. Pierce were described as "strictly investors and not in any way active participants." The instrument in paragraph 5 provided: COMPANY shall develop and plat the * * * [eastern 55.23 acres of the Tanglewood project] into single family residential lots for sale to builders and to the public; the * * * [western 23.27 acres of the Tanglewood project] shall be held by COMPANY for investment, as such property does not, in the opinion of the parties hereto, lend itself to the character of single family residential development. When Mr. Wray and the Company purchased the tracts which make up the 78.5 acres of the Tanglewood project, each was undeveloped with numerous trees and bushes growing throughout. In late 1969 or early 1970, development of the 78.5-acre tract was begun by the Company. The first development step was the erection of a dike in the northeast corner to drain the land. Once drained the land was cleared of its trees and *34 underbrush, which were then piled and burned. Canals were laid out, dredged, shaped and refilled so that the eastern 55.23 acres (hereinafter the "55 acres") consisted of lots which were for the most part valuable waterfront property. The canals followed the natural contours of the existing bayou. Although no decision on how or whether to fully develop the western 23.27 acres (hereinafter the "23 acres") was made by the Company or the Partnership, Mr. Wray decided to remove the underbrush and clear that portion as well as the eastern portion. The western 23 acres, unlike the eastern 55 acres, [6] *35 was in need of fill for proper development. Since dredging the canals created an excess of such dirt, Mr. Wray decided that the dirt should be used to fill the 23 acres. [7] Spreading dirt without removing underbrush and clearing the land was not feasible. When the canals were dug to the required depth and filled with water, the development became waterfront property. By July of 1970, the underbrush had been removed from the entire 78.5 acres, and the land had been cleared an filled to grade. The canals had been dredged, shaped and filled with water. The 23 acres is a rectangular parcel, perhaps 400 feet east to west by 2200 feet south to north, running laong the entire western edge of the 78.5-acre tract. The southern edge of the 78.5 acres is defined by 67th Avenue Northeast and is across the road to the north and slightly west of Shore Acres Elementary School. The 23 acres are bordered to the west by a 400-acre city park and to the east by the main canal of the Tanglewood development, which provides access to Tampa Bay. While the canal has tributaries which wind through the 55-acre single family development, only the main canal touches the western 23-acre parcel. Through the center of the 23-acre tract, running north-south at the time of purchase and early development, was *36 a limited access road, County Road No. 151. The area north of the entire tract was undeveloped land which, in years following those here in issue, the Company developed as a single family project called Harbor Isles. To the east of the 78.5-acre tract is Tampa Bay. The county road split what was already a narrow parcel of land into two even narrower strips. Originally, Mr. Wray had tried to design a single family development for the 23-acre tract, but the road created a problem. The road was a major artery for traffic between Tampa and northeast St. Petersburg and had an ingress and egress every 660 feet. The strip of land west of the road was only 129 feet deep which caused an additional road to be impractical. After a number of attempts at designing a single family development for the 23-acre tract, it became clear to Mr. Wray that the property was not suitable for such a use. Since the land was zoned R-1 and R-2, single family residential, Mr. Wray applied to the St. Petersburg Planning Commission on March 24, 1970, for a zoning change to R-3, multi-family residential. The application specified apartments as the use for which the zoning change was sought. [8] Although on *37 June 15, 1970, the Planning Commission approved the application, the final vote by the City Commission denied the change on July 23, 1970. Meanwhile development of the eastern 55 acres was progressing quickly. That tract was subdivided into what is known today as Tanglewood Isles Subdivision and Tanglewood Subdivision. The two subdivisions contained 146 lots. Home construction was begun before the formal partnership agreement of May 18, 1970, was executed. Some 8 to 10 of the first houses were built by the Company, but the purchase of lots by the Company from the Partnership was viewed as unfair competition by other builders with options on the Tanglewood lots and was therefore discontinued at the request of those builders. Most of the lots were first optioned to builders who then *38 purchased them and built single family residences thereon. The Partnership reported all of these sales as producing ordinary income. Although the underbrush was removed from the western 23 acres and the land was cleared [9] and filled, and the main canal made both the western and eastern tracts waterfront property, the Partnership allocated all of the development costs to the eastern 55 acres. [9] On May 1, 1971, W. Langston Holland[10] as trustee entered into an option agreement on behalf of Messers. Wray, Pierce and Kent under which they possessed the right to purchase certain lands in Pinellas County, Florida. The land consisted of some 280 acres to the north and northwest of the Tanglewood development. Subsequently the land was purchased by Messers. Wray, Pierce, and Kent the Company, or the Partnership. [11] Of the 280 acres, the 100 acres to the northwest of the Tanglewood development were sold in later years to the city thereby extending northward the city park which is the western boundary of the Tanglewood development. The 180 acres directly north *39 of the Tanglewood project were developed for single family homes. By November of 1975, 90 lots of the first phase of that development had completed houses built on them. On June 11, 1971, another application was made for rezoning the 23 acres as R-3, multifamily residential. Additionally, the Partnership applied for vacation of County Road No. 151 which ran north and south through the center of the 23 acres. In July of 1971, the Partnership retained Land Design/Research, Inc. (hereinafter "Land Design") of Columbia, Maryland, a land planning and design firm. On August 31, 1971, Land Design billed Mr. Wray $1,300 for "Townhouse Project - Completion of Phase I - Site Analysis, and Phase II - Design Concepts A and B." On September 20, 1971, Land Design billed Mr. Wray $1,881.20 for "Townhouse Project - Completion of Phase III - Site Plan and Sketches." The following documents were prepared by Land Design with respect to the 23 acres: Summary Analysis, dated August 26, 1971; Design *40 Concept B, dated August 26, 1971; Design Concept A, dated August 27, 1971; Site Development Plan, dated September 3, 1971; and 2 architectural renderings. Both A and B were low density multifamily concepts. Concept A called for all 2-story townhouse structures - a concept easily adaptable to both condominiums and apartments. Concept B included for the most part 2-story townhouse structures; however, it also included 3-story structures - a concept more easily adaptable to apartments than condominiums. Although condominiums were considered, the Partnership decided to present Concept B apartments as the proposed use of the land. The Partnership engaged an attorney expert in zoning to direct the application to the City Commission and Land Design was hired to give the presentation. At the hearing, Land Design presented both concepts and explained that the Partnership had selected Concept B for apartments to be placed on the 23 acres if the property were rezoned R-3. On September 9, 1971, the City Commission accepted the July 19, 1971, rezoning order of the Planning Commission, [12] rezoning the 23 acres R-3, and allowing vacation of County Road No. 151. [13] The zoning and vacation orders *41 became effective September 29, 1971. In September or October of 1971, the Partnership contacted Randolph Wedding, a St. Petersburg architect. He was hired to perform an architectural and marketing survey concerning the 23 acres. Both condominiums and apartments were examined. He issued a report dated November 10, 1971 entitled: "Feasibility of Tanglewood Apartments as a Condominium or as a Rental Apartment." The study made the following assumptions: (1) that the land cost $500,000 and was owned outright; (2) that the number and size of units would be 35 one-bedroom units of 800 square feet each, 106 two-bedroom units of 1,100 square feet each, and 35 three-bedroom units of 1,300 square feet each; (3) that the units would be built as townhouses at a cost of $12 per square foot, i.e. 176 units with 190,100 square feet at a cost of $2,300,000 to build; (4) site preparation, landscaping, and recreation facilities costs would *42 be $350,000; (5) fees and permits would cost $130,000; and (6) interest on construction loan would be $150,000. Thus, the total cost of the project was estimated at $3,430,000. The study next estimated the selling price of condominiums at $25 a square foot, a gross selling price of $4,752,500. With an estimate of 7 percent for sale costs, $333,000, and a construction cost of $3,430,000, the sale of condominiums would, according to Mr. Wedding's report, result in a profit of $989,500. Income projections for apartments were made based on rentals of both 25 cents and 22 cents per square foot. A $2,900,000 25-year permanent mortgage at 9 percent interest was assumed. The study then compared the rents with those of two similar apartments in the St. Petersburg area: Tanglewood
Coquina
25 Cents
22 Cents
Key Arms
Porto Cadiz
1 B.R. $200/mo $176 $168 $180
2 B.R.
275
292[sic]
214
265
3 B.R.
325
286
300
285
Total Rental
Income
All Units
$570,300
$502,000
Thus, it was noted: "At 25 cents per sq. foot the Tanglewood Apartments would be significantly more expensive than Coquina Key Arms or Porto Cadiz." The project net return from apartment rentals was explained as follows: Per Sq. Ft.
@25&
@22&
5% Vacancy
$ 28,500
$ 25,100
10% Management Including Salaries
57,000
50,200
Utilities
20,000
20,000
Insurance
10,000
10,000
Real Estate Taxes
70,000
70,000
Maintenance & Replacements (7%)
40,000
35,100
225,500
210,400
Debt Service at 9%
292,300
292,300
517,800
502,700
Rental Income
570,300
502,000
Net on Land Investment
52,500 x)
(700) x)
*43 A second portion of the study concluded that 25 cents per square foot was the minimum rental for an adequate return on the investment. Because the location of the proposed Tanglewood apartments was judged superior to that of the Coquina Key Arms or the Porto Cadiz apartments, the study concluded that the 25 cents per square foot rental was economically feasible. The study also reported on a mail survey of persons employed in Pinellas County and Northwestern Hillsborough County with incomes greater than $10,000, i.e. the market to which Tanglewood apartments would be rented or condominiums sold: The study concluded: Based on this survey the following is indicated: (1) In spite of the overwhelming preference for ownership expressed by these heads of non-retiree households, a substantial percentage of these households based on actual experience are prospects for rental housing. (2) Most of these are drawn from the 35% of the households who are less than five years in the area. These "new arrivals" traditionally prefer to rent until they decide where to buy. (3) To accommodate this characteristic of the market, a rental plan with option to buy may *44 be indicated for at least some of the units. (4) The sizes of households and their bedroom and bathroom requirements indicate that two and three bedroom units with two baths should predominate. In late November of 1971, Mr. Wray decided that development of the 23 acres as a low density multifamily community could begin. In light of Mr. Wedding's feasibility study, Mr. Wray expected to build apartments pursuant to Concept B. Messers. Wray, Kent and Pierce planned that if apartments were built, they would be kept by the Wray-Pierce-Kent interests as a long-term investment. Mr. Wray contacted his attorney, Mr. Holland, concerning the development of the 23 acres. Mr. Holland advised him that the best course of action would be to form a separate subchapter S corporation with Messers. Wray, Pierce and Kent as shareholders and have the Partnership sell the 23 acres to the corporation. The reasons for his advice were as follows: (1) To separate the 23-acre project from the 55-acre one so that the success of the 55-acre project would not be jeopardized by setbacks and liabilities of the 23-acre project; (2) to set a current value on the 23 acres for purposes of attracting new investors *45 and for purposes of obtaining loans from financial institutions; (3) to limit liability with the corporate form; and (4) to take advantage of being able to pass through initial losses to the shareholders of a subchapter S corporation. [14]
Mr. Holland had formed Reiman Enterprises, Inc. (hereinafter "Reiman") in Florida on July 16, 1968. All Reiman stock was subscribed for by Mr. Holland. He held all of the stock from July 16, 1968, to November 30, 1971, but Reiman was inactive. Mr. Holland kept such corporations on hand for situations like Mr. Wray's where a client needed a corporation formed quickly. Reiman's income tax return for the period ending August 31, 1972, [15] shows that on December 1, 1971, all of Reiman's stock was acquired as follows: No. of Shares
Percent Shareholder
Acquired
Ownership
Robert D. Wray
200
40
Barbara D. Wray
100
20
Lewis H. Kent
100
20
Kirk I. Pierce
100
20
500
100 [16] *46 On December 2, 1971, Reiman and the Partnership executed a "Contract for Sale and Purchase of Real Estate" wherein Reiman agreed to purchase the 23 acres from the Partnership. The contract provided for no payment until closing and that closing was to be 120 days after execution. At closing, upon delivery of the deed, the contract provided for a cash payment of $5,000. It also provided for a purchase money mortgage and note bearing 5 percent interest per annum in the principal amount of $280,000 payable in 5 equal installments of $56,000 plus accrued interest. The first installment was due 18 months after closing. Additionally, the contract provided for immediate possession of the property by Reiman upon execution of the contract and gave Reiman the right to begin improvement construction. On the week-end of December 4th and 5th, 1971, Mr. Wray was visited by Barbara Wall. Mrs. Wall knew Mr. Wray socially and had purchased a home from him in the Ponderosa project. Mrs. Wall was a real estate broker experienced in property management. Prior to the week-end of December 4th and 5th, 1971, Mrs. Wall and Mr. Wray had discussed the 23 acres and the possibility of *47 building apartments thereon. Mr. Wray had advised her of his plans to finance part of the construction by taking on investors. Mrs. Wall had expressed interest in being such an investor, for perhaps $10,000, and in being the resident manager at such an apartment complex. On the week-end of December 4th and 5th, 1971, Mrs. Wall inquired as to the selling price of a few acres of the project because she was interested in building a small apartment complex of her own. Mr. Wray suggested a selling price of $20,000 per acre. Mrs. Wall considered this price to be too high for her project. She asked Mr. Wray if he would be interested in selling the whole property. Mr. Wray indicated that he would be interested in selling. On Monday, December 6, 1971, Mrs. Wall mentioned the property at the Monday morning sales meeting of Investment Services, Inc., the real estate firm for which she worked. She informed those at the meeting that the 23 acres might be available. Later that day, her broker, Gerard J. Curley, told Mrs. Wall to contract Richard Cope at Rodgers & Cummings, Incorporated, a brokerage and insurance firm in Clearwater, Florida. Mr. Curley believed that Mr. Cope had a client *48 who was interested in St. Petersburg waterfront property. Mrs. Wall called Mr. Cope that day and arranged a meeting with him for 10:00 a.m., Thursday, December 9, 1971. Mrs. Wall arranged to meet with Mr. Wray at 10:30 a.m. on December 9, 1971. On December 6, 1971, the Company, pursuant to an oral agreement with Reiman, began work on a seawall for the main canal bordering the 23 acres to the east. The agreement allowed the Company to charge cost plus 10 percent for the seawall, an amount which came to around $22,000. On December 9th, Mrs. Wall met with Mr. Cope and showed him the 23 acres. Mr. Cope, on behalf of his employer Rodgers & Cummings, Incorporated, was acting as a real estate agent for M.J. Brock and Sons, Inc. (hereinafter "M. J. Brock") of Los Angeles, California. Mr. Cope researched properties for M. J. Brock during 1971 and 1972. In that time period, Mr. Cope looked at 30 or 40 properties as potential purchases for M. J. Brock, five of which were eventually bought by M. J. Brock for substantial sums. After seeing the property on the 9th, Mr. Cope and Mrs. Wall met with Mr. Wray at his home. At that meeting Mr. Wray reviewed the Concept B layout that he was planning *49 for the project, and he discussed the proposed Harbour Isle and Weedon Isle projects to the north. The parties discussed the general question of the best use for the 23 acres, be it condominiums, apartments or single family housing. Mr. Cope approached the question of price at this meeting with a cost figure per unit delivered to M. J. Brock improved, completed and ready for building. [17] The selling price discussed was $400,000 with no expenses to the seller, what was termed a net net net price. [18] Additionally, further improvements to the land by Reiman were noted as negotiable. On December 17, 1971, Mr. Cope wrote R. C. Chenoweth, Executive Vice President of M. J. Brock, located in Los Angeles, California. The letter read as follows: I have been continuing my efforts to look for sites I feel might be of interest for a family and adult *50 townhouse development. I am selecting sites and sort of shooting from the hip --- any additional guidelines you could provide would really be of help. I have been working with a gentleman in St. Petersburg and he introduced me to Robert D. Wray, a major land developer in the Northeast area. The site is approximately 24 acres MOL with improved streets, sewer, and water. It is within walking distance of elementary and junior high schools and offers 2,200' of seawalled waterfront property. It is also contiguous to a city park which is supposed to be developed into a community golf course. Bordering on 62nd Avenue North, the 2,200' x 400' deep site is zoned St. Petersburg R-3 and will permit 172 units at a land cost of $2,616 per unit (sale price, $450,000). Surrounding houses are from $30,000 - $60,000 and the current owner has a complete development package and land plan available for townhouses. He owns hundreds of acres to the north and would be willing to enter into an agreement not to compete in the particular market that you designated. I did not disclose our area of interest. Mr. Wray is considering rentals and plans to develop the property if it is not sold. The property *51 is within minutes of Northeast Plaza and has a direct link to I-75 and Gandy Bridge to Tampa. Mr. Wray estimated that over 30% of the residents in his single family homes work in the Tampa area. The site is approximately eight minutes from the new Kroger office complex. Dick, I am enclosing additional photographs, etc. Mr. Wray has not entered the multi-family housing market as yet, but this is the tract most suited among his holdings. A copy of this letter was sent to James Stacy, an M. J. Brock representative in Clearwater, Florida. On December 20, 1971, Mr. Wray paid $600 for his and his wife's stock in Reiman. On December 28, 1971, Mr. Kent and Mr. Pierce each paid $200 for their 20 percent shares of Reiman.Additionally, on the 28th, Messers. Wray, Pierce and Kent either loaned or contributed capital to Reiman in the amounts of $12,000, $4,000 and $4,000 respectively. In January of 1972, negotiations between M. J. Brock and Mr. Wray continued. Mr. Wray was concerned about the use of the land because of his interest in the developments to the east and north of the 23 acres. Sometime in February of 1972, Messrs. Wray, Pierce and Kent loaned or contributed capital to Reiman *52 in the amounts of $12,000, $4,000 and $4,000, respectively. On February 18, 1972, M. J. Brock's attorney forwarded a proposed "Guarantee of Performance" agreement for execution by the Company in anticipation of purchasing the 23 acres.This document was to protect M. J. Brock by ensuring performance of the Company in its sales contract with Reiman. Without such a guarantee, if the Company did not transfer the property to Reiman and Reiman thus defaulted in its obligation to convey to M. J. Brock, the only action available for M. J. Brock might be one against Reiman, a corporation with little or no assets outside its contract with the Company. On February 21, 1972, M. J. Brock, as buyer, entered into a contract of sale with Reiman, as seller, under which the 23 acres would be sold for $450,000. A deposit of $20,000 was paid under the contract. The rest of the purchase price was due at closing. Before April 24, 1972, subject to inspection of the premises to verify Reiman's representation of the land, M. J. Brock was required to give notice if he chose not to close on or before August 1, 1972. In that case the deposit, less $10,000, would be returned and the contract considered *53 null and void. Otherwise the contract was to be closed on or before August 1, 1972. Once M. J. Brock exercised its option and decided to close on or before August 1, 1972, Reiman agreed to construct at its expense the following improvements: (1) a seawall running the entire eastern boundary of the 23 acres; (2) city sewer and water lines sufficient to serve the property; (3) initial fill of the property to grade, meeting all Government specifications of agencies with jurisdiction over the property; (4) a road not less than 32 feet wide in keeping with city specifications, constructed on the 40-foot road right-of-way adjacent to the western boundary of the property; (5) removal of the present road and compaction of any fill used to the extent necessary for construction of the planned 2-story building units and other related improvements; (6) removal of existing power lines and underground replacement thereof; (7) installation of all necessary electrical and telephone lines underground; and, (8) platting as required by the city. The contract further called for Reiman to retain Land Design to plan the development. The final plan for the project was made subject to the reasonable approval *54 of both the buyer and the seller. Additionally, Reiman reserved the right to approve the final architectural design of the housing units. [19]
If, after April 24, 1972, M. J. Brock failed to perform, the deposit paid as consideration for the execution of the agreement could be returned in full settlement of any damage claims relieving all parties of all obligations under the contract, or Reiman could proceed to enforce its legal rights by specific performance or otherwise. On February 25, 1972, Mr. Wray signed the Guarantee of Performance on behlaf of the Company and on that same day Mr. Wray signed the Commission Agreement between Reiman, Rodgers & Cummings, Incorporated (Cope) and Investors Service, Inc. (Wall). The Commission Agreement called for the two *55 real estate agents to split the commission. The agreement further called for $400,000 of the $450,000 to go to Reiman with the remainder, less closing expense normally chargeable to the seller, going as commission to the real estate agents. On May 10, 1972, Messrs. Wray, Pierce and Kent loaned or contributed capital to Reiman in the amounts of $30,000, $10,000 and $10,000, respectively. On March 27, 1972, a warranty deed transferring the 23 acres from the Company to Reiman was executed. Also on that date a mortgage and note were given by Reiman to the Company covering the 23 acres. Neither the mortgage nor the deed, however, was recorded in the official records of Pinellas County until April 25, 1972. The following closing statement dated March 27, 1972, was prepared by Mr. Holland: Description: 23.27 Acres MOL, as described by metes and bounds located in portion of W. 1/2 of NW 1/4 of 33-30-17 East Seller: Robert D. Wray Construction Co. Buyer: Reiman Enterprises, Inc.
Date: March 27, 1972 CREDITS TO SELLER:
Purchase Price
$ 285,000.00
Pro-rated Insurance
Prepaid Interest
Recording Deed
6.00
Documentary stamps on note
420.00
Other
TOTAL CREDITS TO SELLER:
$ 285,426.00
CREDITS TO BUYER: *56 Earnest Money Parcel(1) $ 682.20 $
Parc. (2) 1,110.47
Pro-rated Taxes based on 1971 taxes
with allowable discount at 4.715
per diem from 1/1/72 thru 3/27/72
410.21
Other - Purchase money 2nd mtg.
280,000.00
Credit as per contract (re title
insurance)
500.00
TOTAL CREDITS TO BUYER:
$ 280,910.21
BALANCE DUE ON CLOSING:
$ 4,515.79
COSTS TO SELLERS:
Documentary stamps on deed: State $ 855.00
Federal
313.50
Recording Deed
6.00
Recording P.R.M.
Recording Mortgage
10.00
State stamps on note
420.00
Intangible tax on mortgage
560.00
Satisfaction of mortgage (recording)
Policy costs
Paid on existing mortgage
Other
TOTAL COSTS:
$ 2,164.50
NET TO SELLER:
2,351.29
The following escrow statement was prepared on March 27, 1972 in connection with the closing between the Company and Reiman: ESCROW STATEMENT
Description: 23.27 Acres MOL, as described by metes and bounds located in portion of W. 1/2 of NW 1/4 of 33-30-17 Seller: Robert D. Wray Construction Co. Buyer: Reiman Enterprises, Inc.
Date: March 27, 1972 Receipts:
Cash at closing
$ 4,515.79
Disbursements:
1. Clerk of the Circuit Court
$ 2,164.50
2. Robert D. Wray Construction
Co.
2,351.29
Total
$ 4,515.79
The Partnership filed a partnership return of income for 1972 reporting a $194,699.46 *57 long-term capital gain on the transfer of the 23 acres computed as follows: Selling price
$ 285,000.00
Less: Cost of land
$ 82,944.81
Payments to Land
Design/Research, Inc.
3,181.20
Payment to City of
St. Petersburg
1,931.53
Closing costs
2,242.90
Total cost of land and other charges
90,300.54 *
Long-term capital gain
$ 194,699.46
The transaction between Reiman and M. J. Brock was consummated on August 1, 1972, by a cash payment of $430,000 from M. J. Brock. Reiman reported an $18,239.75 profit on the sale as ordinary income computed as follows: Selling Price
$ 450,000.00
Less: Cost of Land
$ 285,426.00
Title Insurance
760.00
Closing Cost
1,854.00
Real Estate Commission
44,065.00
Development Cost
98,376.85
Legal Fee
1,000.00
Prepare and Record Plat
278.00
Total Cost of Land and Other Charges
$431,760.25*
Total Profit on the Sale
$ 18,239.75 After 1972, Reiman was inactive.The 23 acres was the only asset and the only business activity of Reiman during its entire existence. Reiman's income tax return for its fiscal year ending August 31, 1972, lists its principal business activity as "real estate development." M. J. Brock subsequently developed the 23 acres *58 as a low density condominium project. M. J. Brock prepared its own plans for the project, rejecting those Mr. Wray and Land Design had developed because it did not consider these to be suitable for a condominium project. In 1974, after an investigation of the Federal income tax returns of Reiman and the partners of the Tanglewood Partnership, respondent issued a deficiency notice to Mr. and Mrs. Wray for the calendar year 1972 and a deficiency notice to Mr. and Mrs. Kent for the calendar year 1972 and determined that the transfer of the property by the Partnership to Reiman constituted a non-taxable exchange under Section 351. Therefore the basis of the property in Reiman's hands was decreased to that in the hands of the Partnership. Reiman's gain on the sale to M. J. Brock was thereby increased. Deficiencies were determined against the Wrays and the Kents as stockholders of Reiman, a sub-Chapter S, Corporation. As to the Wrays and Kents, respondent's determination of deficiency related primarily to the transactions between the Partnership and Reiman. The statutory notices of deficiency for calendar year 1972 which were issued to the Wrays and Kents on October 31, 1974 determined *59 a deficiency of $8,354.45 against the Kents. On January 31, 1975, the Wrays and Kents filed a joint petition with this Court (Docket No. 974-75). On October 31, 1974, the Federal income tax liability of the Pierces was still being considered by employees of the Internal Revenue Service. The agent who had audited the Pierces' income tax returns for 1971 and 1972, had proposed a number of changes in their tax liability unrelated to the transfer of the 23 acres of property to Reiman. Some time after the filing of the petition in the Wray-Kent case, the Pierces' attorney and the District Conferee of the Internal Revenue Service resolved all questions respecting the Pierce's 1971 and 1972 Federal income tax liabilities except the gain with respect to the sale of the 23 acres. The Pierces' attorney and the District Conferee executed a partial settlement, Form 870, with respect to the Pierces' 1972 Federal income tax liability disposing of all controversies between them for that year except the gain on the sale by Reiman of the 23 acres. The Pierces' attorney and the District Conferee agreed orally that a final settlement of the Pierces' tax liability for 1972 should not be arrived at *60 until after a decision had been entered by this Court in the case of Robert D. Wray, et al. v. Commissioner, Docket No. 974-75, (hereinafter the Wray-Kent case). The Pierces' attorney and the District Conferee orally agreed that the issue with respect to the nature of the Pierces' gain on the sale of the 23 acres would be held in sequence so that the decision of this Court in the Wray-Kent case could be followed in resolving the Pierces' 1972 Federal income tax liability. The Pierces' attorney had been practicing tax law since 1960, and he knew that the District Conferee had no authority to bind the Government by an oral agreement with respect to the disposition of the Pierces' 1972 tax liability. On November 17, 1975, respondent moved in the Wray-Kent case to amend his answer to plead in the alternative that if the transfer of the 23 acres to Reiman from the Partnership was not governed by section 351, the gain on the sale of the 23 acres was incorrectly reported by the Wrays and Kents as capital gain. Respondent alleged that the property transferred by Tanglewood to Reiman on March 27, 1972 was not a capital asset within the meaning of section 1221 in the hands of Tanglewood, and *61 that the gain should have been reported by the partners of Tanglewood as ordinary income realized on March 27, 1972 rather than long-term capital gain. [20] Respondent's motion was granted and the amendment to answer filed. The case was tried on November 20-21, 1975.At trial, Mr. Pierce testified for petitioners. Although not a petitioner in that case, Mr. Pierce paid 20 percent of the attorney fees for the litigation. [21] *62 Because the statute of limitations was about to run with respect to the Pierces' tax year 1972 and the decision of the Tax Court in the Wray-Kent case had not been entered, the Pierces executed a Form 872 on December 20, 1975, extending the time for assessing their 1972 income tax until December 31, 1976. After two extensions, the deadline for original briefs in the Wray-Kent case was set for March 22, 1976. Shortly before the deadline, respondent's counsel informed petitioners' counsel that respondent was going to concede a decision of no deficiency, no overpayment. A motion that such a decision be entered was filed by respondent with this Court. This Court issued a show cause order dated April 1, 1976, directing the taxpayers in the Wray-Kent case to show cause on or before April 28, 1976, why respondent's motion should not be granted.No response to the order was filed by the taxpayers in the Wray-Kent case, and no appearance made on their behalf when the case was called for hearing on the show cause order pursuant to the prior notice. On April 30, 1976, this Court entered an order and a decision that there was no deficiency and no overpayment *63 in the Federal income tax of the Wrays for the taxable year 1972 and entered a similar order and decision with respect to the 1972 Federal income tax liability of the Kents. About two months after the entry of the decisions in the Wray-Kent case, the Pierces' attorney called the District Conferee with respect to the 1972 tax liability of the Pierces. The District Conferee informed the Pierces' attorney that the file with respect to the Pierces' 1972 tax liability was in the Regional office in Jacksonville but he believed that the decision in the Wray-Kent case would be followed in determining the Pierces' 1972 tax liability. Soon thereafter, someone from the regional office of the Internal Revenue Service in Jacksonville contacted the Pierces' attorney and told him that the file with respect to the Pierces' 1972 tax liability was being returned to Tampa. The Pierces' attorney again contacted the District Conferee with respect to the 1972 tax liability of the Pierces and the District Conferee asked to be sent a copy of the decision in the Wray-Kent case. The Pierces' attorney sent the following letter, dated October 8, 1976, along with a copy of each order and decision to the District *64 Conferee: IN RE: Kirk I. Pierce and Sandra Pierce, 1972. You will recall we executed a partial settlement (Form 870-1) in this matter as to the 1972 tax year. We also agreed at the time that the remaining issue, inasmuch as it has been filed in the Tax Court by other taxpayers, would be "held in limbo" until the Tax Court rendered its decision. We further agreed that whatever the Tax Court decided would determine the matter for this taxpayer. I then phoned you some months ago to advise you that the Tax Court had found no deficiency as to the other taxpayers and therefore there would be no further sum due from the Pierces for the 1972 tax year. My recollection is that you advised me at that time that it would be handled automatically by Jacksonville. Yesterday Mr. C. E. Lawry phoned me from Jacksonville and said he was sending the matter back to you to resolve. Accordingly, I enclose a photocopy of an order and decision of Judge Irene F. Scott of the Tax Court determining no deficiency in income tax of the petitioners, the Wrays, and the Kents. The District Conferee's superiors in Jacksonville did not consider the Wray-Kent decision as binding on the Government with respect *65 to the Pierces' 1972 tax liability. The Pierces on their Federal income tax return for 1972, Schedule D, reported their share of long-term capital gain from the sale of the 23 acres by the Partnership to Reiman as $38,939.89. Respondent in his notice of deficiency increased their income from the Partnership and recharacterized it as ordinary income with the following explanation: It is determined that (1) The trade or business of the Tanglewood Joint Venture (Tanglewood) during the taxable year 1972 was the purchase and sale of real estate; (2) Tanglewood purchased an interest in 23.27 acres of land located in Shore Acres, St. Petersburg, Florida (the 23.27-acre parcel) in 1970 for the purpose of developing and selling the property to Tanglewood's customers rather than for the purpose of holding the property for an investment as expressed in the agreement dated May 18, 1970, between Robert D. Wray, Robert D. Wray Construction Company, Lewis H' Kent, and Kirk I. Pierce; (3) Tanglewood entered into an agreement to sell the 23.27-acre parcel to M. J. Brock and Sons, Inc. (Brock), on March 27, 1972, through Tanglewood's agent, alter ego, co-participant, or entity acting as Tanglewood's *66 conduit in said transaction, Reiman Enterprises, Inc. (Reiman), and sold the 23.27-acre parcel to Brock on August 1, 1972, for $450,000.00 through Reiman; (4) From the beginning of Tanglewood's involvement with the 23.27-acre parcel in 1970 through August 1, 1972, Tanglewood held the 23.27 acre parcel primarily for sale to its customers in the ordinary course of its business based on the extent of the improvements made to the 23.27-acre parcel in order to improve its saleability; the preparations and planning which Tanglewood engaged in to improve the marketability of the 23.27-acre parcel: the fact that Tanglewood listed the 23.27-acre parcel with brokers and actively solicited buyers for the sale of the 23.27-acre parcel; and the fact that Tanglewood did not segregate the 23.27-acre parcel from its other property which it held for sale to customers in the ordinary course of its business; (5) The 23.27-acre parcel was not a capital asset held as an investment as claimed on Tanglewood's income tax return for the taxable year 1972 but was property held by Tanglewood for sale to customers in the ordinary course of its business; and (6) The gain realized by Tanglewood from the sale of *67 the 23.27-acre parcel in the amount of $215,608.21 is taxable as ordinary income in accordance with Section 61 of the Internal Revenue Code of 1954. Tanglewood's gain on the sale of the 23.27-acre parcel is computed as follows: Selling Price
$ 450,000.00
Less: Cost of land $ 82,944.81
Development costs 103,489.58
Sales expenses 47,957.40
234,391.79
Ordinary income gain from sale of property
$ 215,608.21
Ordinary income as previously adjusted per
RAR dated 7-1-74
98,500.58
Total Ordinary Gain
$ 314,108.79
Taxpayer's portion of gain - 20% of $ 314,108.79=
62,821.76
Income from Tanglewood Partnership as Corrected
$ 62,821.76
Income from Tanglewood Partnership as Reported
20,679.72
Adjustment
$ 42,142.04
Your taxable income is therefore increased $42,142.04 for the year ended December 31, 1972 as computed above. The Wrays on their Federal income tax return for 1973, Schedule D, reported a long-term capital gain from "small business corporations (Subchapter S)" of $107,707.75. [22] *68 Respondent in his notice of deficiency increased their income from the Partnership and recharacterized it as ordinary income with the following explanation: The Robert D. Wray Construction Company, a Subchapter S Corporation, is principally owned by Mr. Robert D. Wray and Mrs. Barbara D. Wray. The corporation holds a 60% partnership interest in Tanglewood Joint Venture. Certain adjustments are required to the partnership's return, therefore, it is determined that * * * [(1) through (6) determinations listed exactly as in the explanation offered the Pierces as quoted above and gain by the partnership was computed exactly as in the deficiency notice sent to the parties.] Total Ordinary Gain
$ 314,108.79
Robert D. Wray Construction Company's
portion of gain - 60% of $ 314,108.79 =
$ 188,465.27
Robert D. Wray Construction Company Ordinary
Income from Tanglewood Partnership as Corrected
$ 188,465.27
Robert D. Wray Construction Company Ordinary
Income from Tanglewood Partnership as adjusted
per RAR dated 7/1/74
59,101.14
Additional Ordinary Income from Partnership
$ 129,364.13
Add: Robert D. Wray Construction Company Income
as Previously Adjusted per RAR dated 7/1/74
28,622.01
Corrected Taxable Income from Robert D. Wray
Construction Company
$ 157,986.14
Robert D. Wray Portion - 46.2% of $ 157,986.14 =
$ 72,989.60
Less: Depreciation
(150.00)
Barbara D. Wray Portion - 46% of $ 157,986.14 =
72,673.62
Income from Robert D. Wray Construction Co.
as Corrected
$ 145,513.22
Income from Robert D. Wray Construction Co.
as Reported
28,948.33
Adjustment
$ 11,6564.89
Your *69 taxable income is therefore increased $116,564.89 for the year ended December 31, 1973 as computed above. OPINION We have stated as separate issues petitioners' contention with respect to the statute of limitations barring the assessment of any tax against the Pierces for 1972 and their contentions with respect to res judicata and collateral estoppel being applicable to the Pierces. However, all these contentions revolve around the same factual circumstances and petitioners' arguments with respect to them overlpa. Petitioners' basic position in support of all these contentions is that the Pierces had some form of agreement with respondent that the decision in the Wray-Kent case would be binding in disposing of their case. Petitioners argue that except for this agreement they would not have signed the Form 872 extending the statute of limitations for assessments of tax against them for 1972. They contend that because of tis understanding they participated in the wray-Kent trial to such an extent as to be privy to the parties in that case and that their reliance on respondent's representations as to the disposition of their tax liability collaterally estops respondent from assessing *70 any income tax deficiency against them for the calendar year 1972. Although petitioners devote a large portion of their brief to these arguments, their factual contentions are not supported by the record and petitioners' legal position is without merit. The record shows that after arriving at a tentative settlement on issues other than the sale of the 23 acres the Pierces' attorney and the District Conferee in Tampa came to an understanding that further consideration of the Pierces' tax liability for 1972 would be deferred until after this Court had entered a decision in the Wray-Kent case since in all likelihood such a decision could be followed in resolving the Pierces' 1972 Federal income tax liability. Both the District Conferee and the Pierces' attorney, however, knew that the District Conferee had no authority to bind the Government by an oral agreement to follow the decision in another case in the disposition of the Pierces' tax liability. In fact, they both knew that any tentative agreement reached between the District Conferee and the Pierces would have to be approved by the District Conferee's superiors in Jacksonville, Florida. The knowledge of both parties in this regard *71 is clear from the record. There is nothing to show that approval was given to any portion of the tentative settlement reached between the District Conferee and the Pierces' attorney by the District Conferee's superiors in Jacksonville prior to issuing the notice of deficiency in this case. Petitioners argue that if the District Conferee's agreement with the Pierces' attorney had not been approved, the Conferee's superiors in Jacksonville would have notified the District Conferee to this effect prior to the time in 1976 when the file was returned to the District Conferee in Tampa. There is absolutely nothing in the record to support this conclusion. There is no clear showing that any statement was submitted by the District Conferee to his superiors in Jacksonville with respect to any oral agreement he may have had with the Pierces' attorney. The clear indication from the record is that the only statement made by the District Conferee in the submission of the Pierces' file to the Jacksonville office was that the Wray-Kent case was pending in the Tax Court and for this reason complete disposition of the Pierces' 1972 tax liability was being deferred until that case was resolved. *72 The inference that petitioners would have this Court draw, that they would not have executed the Form 872 extending the statute of limitations for assessment of a tax against them for the year 1972 except for reliance on the oral agreement of their attorney with the District Conferee as to disposition of the Pierces' 1972 tax liability, is totally unsupoorted by the record. The record shows that on December 20, 1975, 1 month after the trial of the Wray-Kent case in November 1975 and a little over 3-1/2 months prior to the expiration on April 15, 1976, of the statute of limitations with respect to the assessment of tax against the Pierces for 1972, the Pierces executed a Form 872 extending the time for assessment of their 1972 income tax until December 31, 1976. Even though counsel who was representing the Pierces before the Internal Revenue Service stated that he would not have recommended to the Pierces that such an extension be granted had he not been relying on his oral understanding with the District Conferee, the inference from the entire record is that the Pierces would have executed the Form 872 to avoid being sent a notice of deficiency in their 1972 tax, pending decision *73 in the Wray-Kent case. The inference is clear that had the Pierces refused to execute the extension of the statute of limitations a notice of deficiency would have been mailed to them sometime prior to April 15, 1976.We conclude that it was to avoid being sent such a deficiency notice that the Pierces agreed to the extension of the statute of limitations. The Form 872 executed by the Pierces is a properly executed valid extension of the statute of limitations. This record as a whole is clear that the statute had not run on December 10, 1976, when respondent mailed to the Pierces a notice of deficiency in their 1972 tax liability, and that the Pierces' attorney clearly understood the purpose of the Form 872 and also knew that he had no approved or binding agreement with respondent concerning the disposition of the Pierces' 1972 tax liability. Since the facts, in our view, so plainly fail to support the Pierces' contention that they relied to their detriment on an oral understanding between the Pierces' counsel and the District Conferee, or that petitioners executed the extension of the statute of limitations in reliance on a misrepresentation by the District Conferee, no useful purpose *74 would be served in discussing the various legal arguments made by petitioners based on their erroneous factual assumption. We therefore consider it unnecessary to discuss whether parol evidence could under any circumstances be used to vary the terms of a Form 872 agreement to an extension of the statute of limitations for assessment of tax which is properly executed by petitioners and on behalf of respondent and is valid on its face. But see, A. L. Wilson Co. v. Commissioner,24 B.T.A. 1056 (1931); Welz and Zerweck, Inc. v. Commissioner,11 B.T.A. 1416 (1928). The record here is clear that had the Pierces not consented to extend the statute of limitations a deficiency notice would have been sent to them. The Pierces may have hoped that their 1972 tax liability would be disposed of by a decision of this Court in the Wray-Kent case but that hope was far from a condition to their execution of the consent to extend the statute of limitations. The record is also clear that no misrepresentation was made to the Pierces' counsel, or through him to the Pierces, that any oral understanding which the Pierces' counsel reached with the District Conferee was or could be binding on respondent. *75 Petitioners' argument that the Wray-Kent decision is res judicata with respect to the Pierces is also without merit.This contention is premised on the Pierces being in privity with the Wrays and the Kents. Without question, the Wray-Kent decision is res judicata of the 1972 income tax liabilities of the Wrays and the Kents. United States v. International Building Co.,345 U.S. 502 (1953). The decision in the Wray-Kent case, whether or not considered as a decision on the merits of the case, would be res judicata as to a person privy to the Wrays and the Kents, as for instance a transferee. Krueger v. Commissioner,48 T.C. 824, 829-830 (1967). As pointed out in the Krueger case, the theory underlying res judicata as to the parties and their privies is that the decision is entered after the parties have had an opportunity to raise all pertinent considerations and even though the parties agree to waive that opportunity they are not entitled to be provided with another occasion to have the merits of the issue considered. It is, however, clear here that the Pierces are not privy to either the Wrays or the Kents in a sense that a transferee is the privy of a transferor. It is not the *76 tax liability for 1972 of te Wrays or the Kents which is being asserted against the Pierces but rather the Pierces' tax liability. As was pointed out in Mathisen v. Commissioner,22 T.C. 995, 998 (1954), it is clear that a partner, solely by reason of the partnership relationship, is not privy with the other partners since one partner's interest is not derived from another partner but is an independent interest. Petitioners, however, contend that under the definition of a person privy in Souffront v. LaCompagnie des Sucreries,217 U.S. 475, 486-487 (1910), as one who prosecutes or defends a suit in the name of another to establish or protect his own rights, the Pierces are privy to the Wrays and Kents. The facts here do not fall within the definition given by petitioners. The Pierces did not prosecute or defend the Wray-Kent suit and were not bound by the judgment in that suit. Mr. Pierce testified as a witness in the case and the evidence here shows that at some juncture, but unbeknownst to respondent, the Pierces agreed to pay part of the attorney's fees for the Wray-Kent litigation.Had the Wray-Kent case been determined adversely to the Wrays and the Kents, no decision against *77 the Pierces would have been entered upon which respondent could rely to collect any deficiency from the Pierces. There would have been no liability on the part of the Pierces until they agreed to a settlement of their tax liability by signing a waiver of assessments or until a deficiency notice was issued to them and either no appeal taken or, if an appeal was taken to this Court, a decision entered in their case. It is true that had an opinion been written in the Wray-Kent case and a decision entered thereafter, under the rule of staredecisis the holding in that case might well have been followed by the respondent in the Pierces' case. However, had the decision in the Wray-Kent case been based on a lack of proof or an omission to introduce pertinent evidence by the Wrays and Kents it might well have not been considered a precedent by either respondent or the Pierces in disposing of the Pierces' case. After receipt of a notice of deficiency the Pierces would have been entitled to file a petition in this Court and litigate their tax liabilities and if they were able to produce additional proof a different decision might be reached on the merits of their case. See American Range Lines, Inc. v. Commissioner,17 T.C. 764 (1951), *78 in which we pointed out that a person not bound by a decision in a prior case is not a party privy so as to cause res judicata to apply. Apparently petitioners contend that the agreement of the Pierces' attorney with the District Conferee in some way bound them by the judgment in the Wray-Kent case. However, as we have heretofore pointed out, this is simply not so. For this same reason the instant case is totally distinquishable from the case of Columbia Insurance Co. v. Mart Waterman Co.,11 F.2d 216 (2d Cir. 1926), on which petitioners rely. The facts in that case show an agreement among the various insurance companies involved to equally participate in payment of any judgment rendered, as well as the defense of the case, and the knowledge of the other party and the Court of this agreement. Much of what we have stated about why the Wray-Kent decision is not res judicata to the Pierces' 1972 tax liability applies equally to the Pierces' argument with respect to collateral estoppel.Furthermore, the decision in the Wray-Kent case was not a decision on the merits of the case so as to make collateral estoppel applicable. In Tait v. Western Maryland Railroad Co.,289 U.S. 620 (1933), *79 and Commissioner v. Sunnen,333 U.S. 591 (1948), it was pointed out that where a cause of action is separate from one previously litigated estoppel applies not to matters which might have been litigated and determined but only to those matters actually litigated and decided. In United States v. International Building Co.,345 U.S. 502 (1953), the Court held that a decision entered upon an agreement of the parties did not cause collateral estoppel to apply to the same parties in a different cause of action where there was no showing that the agreement of the parties was based on the merits of the case. A prior judgment would act as collateral estoppel only to matters actually presented and determined in the prior case. The petitioners also contend that the doctrine of collateral estoppel bars respondent from assessing any tax against the Wrays for the year 1973. They argue that a concession by respondent is not comparable to a decision entered pursuant to an agreement such as was involved in the International Building Co. case. However, in Coors v. Commissioner,60 T.C. 368, 391-392 (1973), affd. sub. nom. Adolph Coors Co. v. Commissioners,519 F. 2d 1280 (10th Cir. 1975), we *80 held directly to the contrary. In the Coors case, respondent had raised an issue in years prior to 1965 concerning the taxpayer's accounting method. When the case for those prior years was before this Court, respondent conceded error with respect to that issue. For the years 1965 and 1966 involved in Coors v. Commissioner,supra, respondent made the same determination as he had made in prior years with respect to the company's accounting treatment of certain items. The taxpayers argued that the concession of this identical adjustment for prior years in a case before this Court collaterally estopped respondent from raising the identical issue with respect to the subsequent years. We specifically held that the abandonment of an issue with respect to certain tax years does not bar the Commissioner from raising the issue again in later years. In affirming our holding in this respect, the Circuit Court pointed out, at 1283, that the doctrine of collateral estoppel is strictly applied in tax cases and was not applicable where an issue was raised but not judicially determined in a prior year. In the instant case all respondent did was concede error in the determination of deficiencies *81 in the prior case and there was no judicial determination of any issue raised in the prior case. It should also be noted that when respondent moved that a decision of no deficiency and no overpayment be entered in this Court, notice was served on petitioners of the filing of the motion by respondent and petitioners were allowed ample time to show cause why respondent's motion should not be granted. Had petitioners in the Wray-Kent case desired to have a decision on the merits of that case, the opportunity was afforded to them to show why respondent's concession should not be accepted. They in no way availed themselves of this opportunity. They did not reply to the show cause order and there was no appearance on their behalf at the hearing on respondent's motion. See McGowan v. Commissioner,67 T.C. 599, 604-611 (1976), in which we refused to permit concession of an issue by respondent where the taxpayer objected to the attempted concession. We conclude that the statute of limitations does not bar assessment of a deficiency for 1972 against the Pierces; that res judicata is not applicable to the Pierces' 1972 tax liability; that respondent is not collaterally estopped from determining *82 deficiencies in the Pierces' 1972 tax liability with respect to their income from the Partnership by the decision entered on respondent's concession in the Wray-Kent case; and that respondent is not collaterally estopped from determining deficiencies in the Wrays' 1973 income tax liability by the decision entered pursuant to his concession in the Wray-Kent case. The real substantive issue raised in this case is whether the sale by the Partnership or by Reiman to M. J. Brock resulted in ordinary income or capital gain. Respondent's position, as stated in the notice of deficiency, is that either the corporate entity of Reiman should be disregarded or Reiman treated as the agent of the Partnership in the sale of the 23 acres to M. J. Brock. Respondent takes the further position that the sale should be considered not of a capital asset within the meaning of section 1221(1) but rather of property held by the Partnership primarily for sale to customers in the ordinary course of its trade or business. It appears to us that irrespective of our conclusion as to the capital asset issue, a somewhat different tax result would follow if the corporate entity of Reiman was overlooked or Reiman *83 treated as an agent of the Partnership in the sale of the 23 acres than would result if the separate entity or separate interest of Reiman in the property were recognized. However, neither party argues to this effect and both parties consider the issue here involved to turn on the nature of the 23 acres in the hands of the Partnership. Both parties argue at some length whether the separate entity of Reiman should be recognized but not as determinative of the primary issue. In our view, Reiman was initially activated and acquired by the Wrays, Mr. Kent and Mr. Pierce for legitimate business reasons. It was activated at a time when the partners of the Partnership were seriously considering going forward with a plan to construct rental housing on the 23 acres. They were advised to undertake this activity in a separate entity from the Partnership. This reason for the activation of Reiman standing alone is sufficient business purpose to cause Reiman's separate entity not to be ignored. However, there were other reasons for undertaking the construction of rental units through the corporate form of Reiman such as limited liability and the election of Reiman to be a Subchapter S Corporation *84 which meant that the Company could not be one of its stockholders. Our difficulty here arises from the fact that the only agreement entered into between Reiman and the Partnership prior to the time that a sale of the 23 acres to M. J. Brock was imminent was a contract by Reiman to purchase the land from the Partnership. This contract provided for no payment until closing and, in fact, at the time the agreement was entered into Reiman had no assets with which to make any payment. Closing was to be 120 days after the execution of the contract.Prior to this closing date, an agreement had been reached between Mr. Wray, acting either on behalf of the Partnership or on behalf of Reiman, and M. J. Brock for a sale of the 23 acres. Therefore, prior to any actual transfer of the property by the Partnership to Reiman, the business reason for the organization or activation of Reiman had ceased.From that time on Reiman served no purpose except to have the 23 acres transferred to it by the Partnership and then transfer the 23 acres to M. J. Brock. Of course Reiman agreed to do certain work on the 23 acres, but the work was actually done by the Company and the Company was required to give a performance *85 bond to the purchaser. Under these circumstances, it is difficult to understand why the parties went through with a transfer of the property to Reiman followed by a sale of that property by Reiman to M. J. Brock. The property had not been transferred to Reiman on February 21, 1972, when the contract with M. J. Brock was entered into.On the basis of the facts herein, we therefore conclude that in substance the sale of the property to M. J. Brock was by the Partnership even though in form the property was transferred to Reiman after the execution on February 21, 1972, of the contract of sale of the 23 acres to M. J. Brock but prior to its conveyance to M. J. Brock. See Brown v. Commissioner,54 T.C. 1475, 1487-1488 (1970), and cases cited at 1488. Since we conclude that the sale to M. J. Brock was in substance made by the Partnership, it is necessary to determine whether the 23 acres was property held by the Partnership for sale to customers in the ordinary course of its trade or business. Section 1221(1) provides that a capital asset is property held by a taxpayer with certain exceptions one of which is "property held by the taxpayer primarily for sale to customers in the ordinary *86 course of his trade or business." Respondent takes the position that the 23 acres sold to M. J. Brock was not a capital asset in the hands of the Partnership since it was held by the Partnership primarily for sale to customers in the ordinary course of its trade or business.
Whether property is held by a taxpayer for sale to customers in the ordinary course of his trade or business is a question of fact to be determined from the circumstances of each case. United States v. Winthrop,417 F.2d 905, 911 (5th Cir. 1969); Prichett v. Commissioner,63 T.C. 149, 162 (1974). As we pointed out in the Prichett case, the Courts have enumerated various facts which may be considered in making the factual determination but none of these factors is conclusive. Included in the factors to be considered are the purpose for which the property was initially acquired, the purpose for which it was subsequently held and the extent of the improvements, if any, to the property.While the nature of the sellers' business is to be considered, it has long been settled that a person engaged in the real estate business with respect to most of its property can hold other property as a capital asset. Maddux Construction Company v. Commissioner,54 T.C. 1278 (1970). *87 The record here is clear that the 23 acres was physically different from other property acquired and sold by the Partnership and was at all times treated by the Partnership differently from its other property.When Mr. Wray made the first purchase in 1969, the Company was focusing on the eastern acreage for a single family development in which it could sell to other builders and also build homes itself. The Tanglewood single family project was much the same type of project as the successful Ponderosa project, which was the Company's and the Wray's first project. As for the western 23 acres, no initial development decision was made. Soon after the property was acquired, it became clear that the building of single family homes on the property was not feasible. Mr. Wray did, however, believe that an appropriate use could be found for the 23 acres. When the project began to grow, and Mr. Kent and Mr. Pierce became partners with the Company, the written partnership agreement declared that the 23 acres were to be held for investment. The main concern of the Partnership was the 55-acre single family development. Because the 23 acres eventually would have to be cleared no matter what *88 its use, the Partnership had the underbrush removed and the land cleared. This was necessary, however, if the excess dirt from the canal being dug to create waterfront lots in the 55 acres was to be used as fill for the 23 acres. The main canal also made the eastern edge of the 23 acres waterfront property. [23]
The 23 acres were zoned single family residential when the property was acquired. On March 24, 1970, Mr. Wray applied to the St. Petersburg Zoning Commission for a zoning change to allow multifamily residential housing. The application specified apartments as the expected use of the land. However, the record is clear that no firm decision as to the precise use of the land had been reached at that time. The Company had never before built apartments. On March 24, 1970, no plans had been prepared to present with the rezoning application. Also, little had been done toward arranging financing. The granting of the rezoning application would not have prohibited the partnership from building condominiums on the 23 acres or selling the land. In any event, the proposed change was *89 denied on July 23, 1970. Meanwhile home construction on the eastern 55 acres had begun. Additionally, on May 1, 1971, the partners took the initial steps in beginning development of the land to the north of the 78.5 acres. On June 11, 1971, a second application was filed for rezoning the 23 acres as multi-family residential. This application, however, was a more determined effort than the initial one. Before presentation to the Commission, the Partnership retained Land Design to plan suitable lowdensity, multi-family housing for the 23 acres. Land Design responded with Concept A - suitable for apartments and condominiums, and Concept B - best suited for apartments. The Partnership decided to present Concept B apartments to the Commission as their choice for the use of the land. On September 9, 1971, the Commission rezoned the 23 acres as multi-family residential. In September or October of 1971, the Partnership hired a St. Petersburg architect, Randolph Wedding, to perform an architectural and marketing survey for the 23 acres. Both apartments and condominiums were again studied. Clearly the Partnership had made no firm decision as to the use of the property at that time. Based *90 on the Wedding study, in late November of 1971, the Partnership decided that development of a 23-acre, low-density, multi-family community could begin. The Partnership expected to build Concept B apartments and the plan was that the Wray-Kent-Pierce interests could keep the apartments as a long-term investment. On the week-end of December 4th and 5th, 1971, Mrs. Wall and Mr. Wray discussed the 23 acres and its possible uses. Mr. Wray spoke to her of his plan to take on some more investors and build investment apartments. Mrs. Wall expressed interest in being a small investor herself. Other possibilities were discussed. When Mr. Wray was asked by Mrs. Wall if he would be interested in selling the 23 acres, he indicated that he would be interested in selling the land. The details of the discussions that followed the December 4th and 5th meeting between Mr. Wray and Mrs. Wall are set forth in our findings. The final result was the sale of the 23 acres to M. J. Brock. In our view the record is clear that the Partnership was holding the 23 acres at the time the sale to M. J. Brock was negotiated with the intent of retaining it as a long-term investment but without having ruled out *91 the possibility of its sale.A letter written by Mr. Cope to R. C. Chenoweth, Executive Vice President of M. J. Brock, on December 17, 1971, sets forth his understanding of the Partnership's expectations as to the use of the 23 acres. This letter states in part: The current owner has a complete development package and land plan available for townhouses. He owns hundreds of acres to the north and would be willing to enter into an agreement not to compete in the particular market that you designated.* * * Mr. Wray is considering rentals and plans to develop the property if it is not sold. * * * Mr. Wray has not entered the multi-family housing market as yet, but this is the tract most suited among his holdings. In our view the Partnership was holding the 23 acres for the purpose of investment without having ruled out its sale. Under these circumstances we conclude that the Partnership was not holding the property primarily for sale to customers in the ordinary couse of its trade or business. Malat v. Riddell,383 U.S. 569, 572 (1966). As pointed out in the Malat case, "primary" as used in section 1221(1) means "of first importance" or "principally." Under the facts here present, *92 the Partnership was not holding the 23 acres "principally" for sale. Sale as distinguished from investment was not "of first importance." Much of respondent's argument is directed to the fact that part of the increase in the value of the 23-acre tract was occasioned by the development by the Company and the Partnership of adjacent property into single family houses. Certainly the character of the surrounding neighborhood enhanced the value of the 23 acres. Had this development been done by an unrelated person, this enhancement to the value would clearly be considered fortuitous. In a number of cases it has been held that the fact that the other development that enhanced the value of investment property was done by the owner of the investment property did not cause such investment property to cease to be held as a capital asset. See the discussion in United States v. Winthrop,supra, 417 F. 2d at pp. 908-909 and cases cited at p. 909. Respondent argues that the fact that the sales contract entered into on February 21, 1972, provided for extensive construction improvements that the Partnership or Reiman was required to perform indicates that the 23 acres was being prepared by the *93 Partnership for sale. Certainly the amount of development of land is a factor to be considered in determining whether property is held for sale in the ordinary course of a taxpayer's trade or business. However, the improvements required by the contract were to be made between April 24, 1972, when the contract by M. J. Brock to purchase the property became binding, and the August 1, 1972, closing date of the sale. In Reithmeyer v. Commissioner,26 T.C. 804, 813 (1956), we held that the improvements to be considered were those made prior to the sale, stating: It is true that here the petitioners agreed to clear and level the land and to plat and subdivide the property into lots and construct streets and gutters and final settlement or payment of the purchase price was to be deferred until that was done, but the fact remains, at the time of sale the land was merely raw, mined-out land. In the Reithmeyer case the taxpayer was engaged in the business of developing other lots for sale, but we concluded that the property sold as raw land with development to be done under contract for the purchasers did not cause the land so developed to be held for sale to customers in the ordinary course *94 of the taxpayer's trade or business. See also Blackburn v. Phinney, an unreported case (W.D. Tex. 1961, 8 AFTR 2d 5220, 61-2 USTC par. 9599).
Considering all the facts and circumstances of this case, we hold that the 23 acres was not held by the Partnership "primarily" for sale to customers in the ordinary course of its trade or business. Petitioners argue that they should be awarded costs and attorneys' fees. This Court is without statutory authority to award costs or attorneys' fees to petitioners. Key Buick Co. v. Commissioner,68 T.C. 178 (1977). Therefore, we do not consider whether such an award would, if we had such authority, be appropriate under the facts here present. Decision will be entered for the petitioners.
Footnotes
1. Unless otherwise indicated, all statutory references are to the Internal Revenue Code of 1954, as amended and as effective for the years in issue.↩
2. Mr. Wray relied on his wife to keep every bill in a ledger for each house so that the cost of each house was readily available. Thus, he could bid on a similar new house quickly and accurately.
3. Because the owner of the Mastry tract would not sell to a corporation, Mr. Wray and his wife purchased the property in their names. The Roby and Upham tracts were purchased by th( Company. Similarly, the Arnold tract was later acquired in the names of Mr. Wray and his wife. When the tracts were contracted for is not in the record; rather the dates of purchase are based on the dates on which the warranty deeds passing title were recorded. Testimony at the trial indicated a different order of purchase, but no explanation of the recordation dates was offered. Thus, we accept the date of recordation as the date of purchase.
4. For Federal tax purposes, the parties agree that the Tanglewood Joint Venture is a partnership. ↩
5. The agreement called for the Company to suspend other business until June 1, 1970, so that all of its expenses to that date would be considered as development costs of the Tanglewood project. Additionally, Mr. Wray's salary as president of the Company was limited to $9,000 over a 9-month period.Any other salaries to Mr. Wray or his family to be charged as a development cost required the consent of Messers. Pierce and Kent, except for $50 a week for 8 months of bookkeeping which presumably was paid to Mr. Wray's wife.
6. The 55 acres had been partly developed in the 1920's, at least to the extent of adding the necessary fill. Neither piece of land could be characterized as swampland; in fact, both were considered upland properties. 7. There was so much dirt from the canals that some of it was dumped on land to the north of the Tanglewood development. Although the Company subsequently purchased that land for a development of single family homes, at that time its owner had no interest in the Tanglewood project.↩
8. At trial, Mr. Wray also described an attempt to have a portion of the 23-acre tract zoned commercial. The minutes of the June 2, 1970, Planning Commission and Executive Meeting, however, show that Mr. Wray denied this intent and that his commercial plan was for the Weedon Isle project to the north of the Tanglewood development, not for the southern portion of the 23 acres as he testified at trial.↩
9. The cost to remove the underbrush and clear acreage such as that of the Tanglewood project in 1969-1970 was $250 to $350 an acre.↩
10. During the years in question, Mr. Holland was Mr. Wray's attorney. ↩
11. The record indicates only that Mr. Wray was working on the project and that he referred to the principal participants therein as "we."↩
12. The Planning Commission order requiring a covenant from the Partnership to limit the maximum density to 12 units per acre was amended to 8.6 units per acre. ↩
13. The order also called for relocation of the road to the Western Border of the 23 acres by the Partnership.↩
x. Plus Tax Benefits From Depreciation↩
14. Because the corporation was to be one qualified under subchapter S, Mr. Wray and his wife were to be shareholders instead of the Company. See sec. 1371(a)(2)↩.
15. Reiman adopted a fiscal year when Mr. Holland originally created the corporation in 1968.↩
16. Payment for the stock of $1 a share was not made until later in December.
17. M. J. Brock had guidelines for what it would pay for different products. Mr. Cope knew these guidelines and he knew from James Stacy, a M. J. Brock employee, that the 23 acres would be used for condominiums. ↩
18. This represented $450,000 including all expenses and the commission for Mrs. Wall and Mr. Cope, in the agreement eventually reached.↩
19. Although it is not clear from the record when the decision was made, M. J. Brock decided not to use the Land Design plans. Either during negotiations or after the contract was executed, Mr. Wray had gone with representatives of M. J. Brock to meet with Land Design in Columbia, Maryland. Following that meeting, M. J. Brock decided not to use Land Design's plans. Apparently the plans chosen instead were satisfactory to Reiman.↩
*. Correct total is $ 90,300.44↩
*. Correct total is $431,759.85↩
20. The amendment to answer alleged with respect to deficiencies as follows: (p) Deficiencies determined as a result of this alternative position would be revised as follows: Deficiencies
Per Statutory
Increase
Notice
Revised
(Decrease)
Lewis Hall and Ruth D. Kent
(1972) $ 8,354.45
$8,354.45
Robert D. and Barbara D. Wray
(1972) 67,471.15
1,960.50
($65,510.65)
(q) Respondent's alternative position would result in an adjustment increase to the income tax due from Robert D. and Barbara D. Wray for their calendar year 1973 which year is not before the Court at this time. ↩
21. Whether the agreement to pay the attorney fees in the Wray-Kent case was before, after or during that trial is not shown in the record. No details of the agreement were presented and if the agreement was in writing, the instrument is not in the record.
22. The Wrays' shares of the Partnership income were attributable to them by virtue of their ownership of the Company, a Subchapter S Corporation. The record shows that the Company reported its income on a fiscal year basis. On the record counsel for petitioners stated that the Company's fiscal year ended March 31. The Tanglewood Partnership reported the sale of the 23 acres in its 1972 calendar year return of income. Therefore, the Company's distributable share of this gain was received as of December 31, 1972, thereby becoming income to it in its fiscal year 1973 and because the Company was a Subchapter S Corporation, its 1973 fiscal year income was income to the Wrays in their 1973 calendar year.
23. Respondent has not challenged all development costs being allocated to the single family project.↩